Justice Souter
delivered the opinion of the Court.
The case presents two questions: whether due process prohibits Arizona’s use of an insanity test stated solely in terms of the capacity to tell whether an act charged as a crime was right or wrong; and whether Arizona violates due process in restricting consideration of defense evidence of mental illness and incapacity to its bearing on a claim of insanity, thus eliminating its significance directly on the issue of the mental element of the crime charged (known in legal shorthand as the mens rea, or guilty mind). We hold that there is no violation of due process in either instance.
*743 I
In the early hours of June 21, 2000, Officer Jeffrey Moritz of the Flagstaff Police responded in uniform to complaints that a pickup truck with loud music blaring was circling a residential block. When he located the truck, the officer turned on the emergency lights and siren of his marked patrol car, which prompted petitioner Eric Clark, the truck’s driver (then 17), to pull over. Officer Moritz got out of the patrol car and told Clark to stay where he was. Less than a minute later, Clark shot the officer, who died soon after but not before calling the police dispatcher for help. Clark ran away on foot but was arrested later that day with gunpowder residue on his hands; the gun that killed the officer was found nearby, stuffed into a knit cap.
Clark was charged with first-degree murder under Ariz. Rev. Stat. Ann. § 13-1105(A)(3) (West Supp. 2005) for intentionally or knowingly killing a law enforcement officer in the line of duty.[1] In March 2001, Clark was found incompetent to stand trial and was committed to a state hospital for treatment, but two years later the same trial court found his competence restored and ordered him to be tried. Clark waived his right to a jury, and the case was heard by the court.
At trial, Clark did not contest the shooting and death, but relied on his undisputed paranoid schizophrenia at the time of the incident in denying that he had the specific intent to shoot a law enforcement officer or knowledge that he was doing so, as required by the statute. Accordingly, the prosecutor offered circumstantial evidence that Clark knew Officer Moritz was a law enforcement officer. The evidence showed that the officer was in uniform at the time, that he caught *744 up with Clark in a marked police car with emergency lights and siren going, and that Clark acknowledged the symbols of police authority and stopped. The testimony for the prosecution indicated that Clark had intentionally lured an officer to the scene to kill him, having told some people a few weeks before the incident that he wanted to shoot police officers. At the close of the State’s evidence, the trial court denied Clark’s motion for judgment of acquittal for failure to prove intent to kill a law enforcement officer or knowledge that Officer Moritz was a law enforcement officer.
In presenting the defense case, Clark claimed mental illness, which he sought to introduce for two purposes. First, he raised the affirmative defense of insanity, putting the burden on himself to prove by clear and convincing evidence, § 13-502(C) (West 2001), that “at the time of the commission of the criminal act [he] was afflicted with a mental disease or defect of such severity that [he] did not know the criminal act was wrong,” §13-502(A).[2] Second, he aimed to rebut the prosecution’s evidence of the requisite mens rea, that he had acted intentionally or knowingly to kill a law enforcement officer. See, e. g., Record in No. CR 2000-538 (Ariz. Super. Ct.), Doc. 374 (hereinafter Record).
*745 The trial court ruled that Clark could not rely on evidence bearing on insanity to dispute the mens rea. The court cited State v. Mott, 187 Ariz. 536, 931 P. 2d 1046, cert. denied, 520 U. S. 1234 (1997), which “refused to allow psychiatric testimony to negate specific intent,” 187 Ariz., at 541, 931 P. 2d, at 1051, and held that “Arizona does not allow evidence of a defendant’s mental disorder short of insanity ... to negate the mens rea element of a crime,” ibid[3]
As to his insanity, then, Clark presented testimony from classmates, school officials, and his family describing his increasingly bizarre behavior over the year before the shooting. Witnesses testified, for example, that paranoid delusions led Clark to rig a fishing line with beads and wind chimes at home to alert him to intrusion by invaders, and to keep a bird in his automobile to warn of airborne poison. There was lay and expert testimony that Clark thought Flagstaff was populated with “aliens” (some impersonating government agents), the “aliens” were trying to kill him, and bullets were the only way to stop them. A psychiatrist testified that Clark was suffering from paranoid schizophrenia with delusions about “aliens” when he killed Officer Moritz, and he concluded that Clark was incapable of luring the officer or understanding right from wrong and that he was thus insane at the time of the killing. In rebuttal, a psychiatrist for the State gave his opinion that Clark’s paranoid schizophrenia did not keep him from appreciating the wrongfulness of his conduct, as shown by his actions before and after the shooting (such as circling the residential block with music blaring as if to lure the police to intervene, evading the police after the shooting, and hiding the gun).
At the close of the defense case consisting of this evidence bearing on mental illness, the trial court denied Clark’s re *746 newed motion for a directed verdict grounded on failure of the prosecution to show that Clark knew the victim was a police officer.[4] The judge then issued a special verdict of first-degree murder, expressly finding that Clark shot and caused the death of Officer Moritz beyond a reasonable doubt and that Clark had not shown that he was insane at the time. The judge noted that though Clark was indisputably afflicted with paranoid schizophrenia at the time of the shooting, the mental illness “did not . . . distort his perception of reality so severely that he did not know his actions were wrong.” App. 334. For this conclusion, the judge expressly relied on “the facts of the crime, the evaluations of the experts, [Clark’s] actions and behavior both before and after the shooting, and the observations of those that knew [Clark].” Id., at 333. The sentence was life imprisonment without the possibility of release for 25 years.
Clark moved to vacate the judgment and sentence, arguing, among other things, that Arizona’s insanity test and its Mott rule each violate due process. As to the insanity standard, Clark claimed (as he had argued earlier) that the Arizona Legislature had impermissibly narrowed its standard in 1993 when it eliminated the first part of the two-part insanity test announced in M’Naghten’s Case, 10 Cl. & Fin. 200, 8 Eng. Rep. 718 (1843). The court denied the motion.
The Court of Appeals of Arizona affirmed Clark’s conviction, treating the conclusion on sanity as supported by enough evidence to withstand review for abuse of discretion, and holding the State’s insanity scheme consistent with due process. App. 336. As to the latter, the Court of Appeals reasoned that there is no constitutional requirement to recognize an insanity defense at all, the bounds of which are left to the State’s discretion. Beyond that, the appellate court followed Mott, reading it as barring the trial court’s consid *747 eration of evidence of Clark’s mental illness and capacity directly on the element of mens rea. The Supreme Court of Arizona denied further review.
We granted certiorari to decide whether due process prohibits Arizona from thus narrowing its insanity test or from excluding evidence of mental illness and incapacity due to mental illness to rebut evidence of the requisite criminal intent. 546 U. S. 1060 (2005). We now affirm.
II
Clark first says that Arizona’s definition of insanity, being only a fragment of the Victorian standard from which it derives, violates due process. The landmark English rule in M’Naghten’s Case, supra, states that
“the jurors ought to be told . . . that to establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong.” Id., at 210, 8 Eng. Rep., at 722.
The first part asks about cognitive capacity: whether a mental defect leaves a defendant unable to understand what he is doing. The second part presents an ostensibly alternative basis for recognizing a defense of insanity understood as a lack of moral capacity: whether a mental disease or defect leaves a defendant unable to understand that his action is wrong.
When the Arizona Legislature first codified an insanity rule, it adopted the full M’Naghten statement (subject to modifications in details that do not matter here):
“A person is not responsible for criminal conduct if at the time of such conduct the person was suffering from such a mental disease or defect as not to know the na *748 ture and quality of the act or, if such person did know, that such person did not know that what he was doing was wrong.” Ariz. Rev. Stat. Ann. §13-502 (West 1978).[5]
In 1993, the legislature dropped the cognitive incapacity part, leaving only moral incapacity as the nub of the stated definition. See 1993 Ariz. Sess. Laws ch. 256, §§ 2—3.[6] Under current Arizona law, a defendant will not be adjudged insane unless he demonstrates that “at the time of the commission of the criminal act [he] was afflicted with a mental disease or defect of such severity that [he] did not know the criminal act was wrong,” Ariz. Rev. Stat. Ann. § 13-502(A) (West 2001).
A
Clark challenges the 1993 amendment excising the express reference to the cognitive incapacity element. He insists that the side-by-side M’Naghten test represents the minimum that a government must provide in recognizing an alternative to criminal responsibility on grounds of mental illness or defect, and he argues that elimination of the M’Naghten reference to nature and quality “ ‘offends [a] principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,’” Patterson v. *749 New York, 432 U. S. 197, 202 (1977) (quoting Speiser v. Randall, 357 U. S. 513, 523 (1958)); see also Leland v. Oregon, 343 U. S. 790, 798 (1952).
The claim entails no light burden, see Montana v. Egelhoff, 518 U. S. 37, 43 (1996) (plurality opinion), and Clark does not carry it. History shows no deference to M’Naghten that could elevate its formula to the level of fundamental principle, so as to limit the traditional recognition of a State’s capacity to define crimes and defenses, see Patterson, supra, at 210; see also Foucha v. Louisiana, 504 U. S. 71, 96 (1992) (Kennedy, J., dissenting).
Even a cursory examination of the traditional Anglo-American approaches to insanity reveals significant differences among them, with four traditional strains variously combined to yield a diversity of American standards. The main variants are the cognitive incapacity, the moral incapacity, the volitional incapacity, and the product-of-mental-illness tests.[7] The first two emanate from the alternatives stated in the M’Naghten rule. The volitional incapacity or irresistible-impulse test, which surfaced over two centuries ago (first in England,[8] then in this country[9]), asks whether a person was so lacking in volition due to a mental defect or illness that he could not have controlled his actions. And the product-of-mental-illness test was used as early as 1870,[10] and simply asks whether a person’s action was a prod *750 uct of a mental disease or defect.[11] Seventeen States and the Federal Government have adopted a recognizable version of the M’Naghten test with both its cognitive incapacity and moral incapacity components.[12] One State has adopted *751 only M’Naghten’s cognitive incapacity test,[13] and 10 (including Arizona) have adopted the moral incapacity test alone.[14] Fourteen jurisdictions, inspired by the Model Penal Code,[15] have in place an amalgam of the volitional incapacity test and some variant of the moral incapacity test, satisfaction of either (generally by showing a defendant’s substantial lack of capacity) being enough to excuse.[16] Three States combine a full M’Naghten test with a volitional incapacity formula.[17] And New Hampshire alone stands by the product-of-mental-illness test.[18] The alternatives are multiplied further by variations in the prescribed insanity verdict: a significant number of these jurisdictions supplement the traditional “not guilty by reason of insanity” verdict with an *752 alternative of “guilty but mentally ill.”[19] Finally, four States have no affirmative insanity defense,[20] though one provides for a “guilty and mentally ill” verdict.[21] These four, like a number of others that recognize an affirmative insanity defense, allow consideration of evidence of mental illness directly on the element of mens rea defining the offense.[22]
With this varied background, it is clear that no particular formulation has evolved into a baseline for due process, and that the insanity rule, like the conceptualization of criminal offenses, is substantially open to state choice. Indeed, the legitimacy of such choice is the more obvious when one considers the interplay of legal concepts of mental illness or deficiency required for an insanity defense, with the medical concepts of mental abnormality that influence the expert opinion testimony by psychologists and psychiatrists commonly introduced to support or contest insanity claims. For medical definitions devised to justify treatment, like legal ones devised to excuse from conventional criminal responsibility, are subject to flux and disagreement. See infra, at *753 774-775; cf. Leland, 343 U. S., at 800-801 (no due process violation for adopting the M’Naghten standard rather than the irresistible-impulse test because scientific knowledge does not require otherwise and choice of test is a matter of policy). There being such fodder for reasonable debate about what the cognate legal and medical tests should be, due process imposes no single canonical formulation of legal insanity.
B
Nor does Arizona’s abbreviation of the M’Naghten statement raise a proper claim that some constitutional minimum has been shortchanged. Clark’s argument of course assumes that Arizona’s former statement of the M’Naghten rule, with its express alternative of cognitive incapacity, was constitutionally adequate (as we agree). That being so, the abbreviated rule is no less so, for cognitive incapacity is relevant under that statement, just as it was under the more extended formulation, and evidence going to cognitive incapacity has the same significance under the short form as it had under the long.
Though Clark is correct that the application of the moral incapacity test (telling right from wrong) does not necessarily require evaluation of a defendant’s cognitive capacity to appreciate the nature and quality of the acts charged against him, see Brief for Petitioner 46-47, his argument fails to recognize that cognitive incapacity is itself enough to demonstrate moral incapacity. Cognitive incapacity, in other words, is a sufficient condition for establishing a defense of insanity, albeit not a necessary one. As a defendant can therefore make out moral incapacity by demonstrating cognitive incapacity, evidence bearing on whether the defendant knew the nature and quality of his actions is both relevant and admissible. In practical terms, if a defendant did not know what he was doing when he acted, he could not have known that he was performing the wrongful act charged as *754 a crime.[23] Indeed, when the two-part rule was still in effect, the Supreme Court of Arizona held that a jury instruction on insanity containing the moral incapacity part but not a full recitation of the cognitive incapacity part was fine, as the cognitive incapacity part might be “‘treated as adding nothing to the requirement that the accused know his act was wrong.’” State v. Chavez, 143 Ariz. 238, 239, 693 P. 2d 893, 894 (1984) (quoting A. Goldstein, The Insanity Defense 50 (1967)).
The Court of Appeals of Arizona acknowledged as much in this case, too, see App. 350 (“It is difficult to imagine that a defendant who did not appreciate the ‘nature and quality’ of the act he committed would reasonably be able to perceive that the act was ‘wrong’ ”), and thus aligned itself with the long-accepted understanding that the cognitively incapacitated are a subset of the morally incapacitated within the meaning of the standard M’Naghten rule, see, e. g., Goldstein, supra, at 51 (“In those situations where the accused does not know the nature and quality of his act, in the broad sense, he will not know that it was wrong, no matter what construction ‘wrong’ is given”); 1 W. LaFave, Substantive Criminal Law § 7.2(b)(3), p. 536 (2d ed. 2003) (“Many courts feel that knowledge of ‘the nature and quality of the act’ is the mere equivalent of the ability to know that the act was wrong” (citing cases)); id., § 7.2(b)(4), at 537 (“If the defendant does not know the nature and quality of his act, then quite obviously he does not know that his act is ‘wrong,’ and this is true without regard to the interpretation given to the word *755 ‘wrong’”); cf. 1 R. Gerber, Criminal Law of Arizona 502-7, n. 1 (2d ed. 1993).[24]
Clark, indeed, adopted this very analysis himself in the trial court: “[I]f [Clark] did not know he was shooting at a police officer, or believed he had to shoot or be shot, even though his belief was not based in reality, this would establish that he did not know what he was doing was wrong.” Record, Doc. 374, at 1. The trial court apparently agreed, for the judge admitted Clark’s evidence of cognitive incapacity for consideration under the State’s moral incapacity formulation. And Clark can point to no evidence bearing on *756 insanity that was excluded. His psychiatric expert and a number of lay witnesses testified to his delusions, and this evidence tended to support a description of Clark as lacking the capacity to understand that the police officer was a human being. There is no doubt that the trial judge considered the evidence as going to an issue of cognitive capacity, for in finding insanity not proven he said that Clark’s mental illness “did not . . . distort his perception of reality so severely that he did not know his actions were wrong,” App. 334.
We are satisfied that neither in theory nor in practice did Arizona’s 1993 abridgment of the insanity formulation deprive Clark of due process.
Ill
Clark’s second claim of a due process violation challenges the rule adopted by the Supreme Court of Arizona in State v. Mott, 187 Ariz. 536, 931 P. 2d 1046, cert. denied, 520 U. S. 1234 (1997). This case ruled on the admissibility of testimony from a psychologist offered to show that the defendant suffered from battered women’s syndrome and therefore lacked the capacity to form the mens rea of the crime charged against her. The opinion variously referred to the testimony in issue as “psychological testimony,” 187 Ariz., at 541, 931 P. 2d, at 1051, and “expert testimony,” ibid., and implicitly equated it with “expert psychiatric evidence,” id., at 540, 931 P. 2d, at 1050 (internal quotation marks omitted), and “psychiatric testimony,” id., at 541, 931 P. 2d, at 1051.[25] The state court held that testimony of a professional psychologist or psychiatrist about a defendant’s mental incapacity owing to mental disease or defect was admissible, and could be considered, only for its bearing on an insanity defense; such evidence could not be considered on the element *757 of mens rea, that is, what the State must show about a defendant’s mental state (such as intent or understanding) when he performed the act charged against him. See id., at 541, 544, 931 P. 2d, at 1051, 1054.[26]
A
Understanding Clark’s claim requires attention to the categories of evidence with a potential bearing on mens rea. First, there is “observation evidence” in the everyday sense, testimony from those who observed what Clark did and heard what he said; this category would also include testimony that an expert witness might give about Clark’s tendency to think in a certain way and his behavioral characteristics. This evidence may support a professional diagnosis of mental disease and in any event is the kind of evidence that can be relevant to show what in fact was on Clark’s mind when he fired the gun. Observation evidence in the record covers Clark’s behavior at home and with friends, his expressions of belief around the time of the killing that “aliens” were inhabiting the bodies of local people (including government agents),[27] his driving around the neighborhood before the police arrived, and so on. Contrary to the dissent’s characterization, see post, at 782 (opinion of Kennedy, J.), obser *758 vation evidence can be presented by either lay or expert witnesses.
Second, there is “mental-disease evidence” in the form of opinion testimony that Clark suffered from a mental disease with features described by the witness. As was true here, this evidence characteristically but not always[28] comes from professional psychologists or psychiatrists who testify as expert witnesses and base their opinions in part on examination of a defendant, usually conducted after the events in question. The thrust of this evidence was that, based on factual reports, professional observations, and tests, Clark was psychotic at the time in question, with a condition that fell within the category of schizophrenia.
Third, there is evidence we will refer to as “capacity evidence” about a defendant’s capacity for cognition and moral judgment (and ultimately also his capacity to form mens rea). This, too, is opinion evidence. Here, as it usually does,[29] this testimony came from the same experts and concentrated on those specific details of the mental condition that make the difference between sanity and insanity under the Arizona definition.[30] In their respective testimony on *759 these details the experts disagreed: the defense expert gave his opinion that the symptoms or effects of the disease in Clark’s case included inability to appreciate the nature of his action and to tell that it was wrong, whereas the State’s psychiatrist was of the view that Clark was a schizophrenic who was still sufficiently able to appreciate the reality of shooting the officer and to know that it was wrong to do that.[31]
A caveat about these categories is in order. They attempt to identify different kinds of testimony offered in this case in terms of explicit and implicit distinctions made in Mott. What we can say about these categories goes to their cores, however, not their margins. Exact limits have thus not been worked out in any Arizona law that has come to our attention, and in this case, neither the courts in their rulings nor counsel in objections invoked or required precision in applying the Mott rule’s evidentiary treatment, as we explain below. Necessarily, then, our own decision can address only core issues, leaving for other cases any due process claims that may be raised about the treatment of evidence whose categorization is subject to dispute.
*760 B
It is clear that Mott itself imposed no restriction on considering evidence of the first sort, the observation evidence. We read the Mott restriction to apply, rather, to evidence addressing the two issues in testimony that characteristically comes only from psychologists or psychiatrists qualified to give opinions as exp'ert witnesses: mental-disease evidence (whether at the time of the crime a defendant suffered from a mental disease or defect, such as schizophrenia) and capacity evidence (whether the disease or defect left him incapable of performing or experiencing a mental process defined as necessary for sanity such as appreciating the nature and quality of his act and knowing that it was wrong).
Mott was careful to distinguish this kind of opinion evidence from observation evidence generally and even from observation evidence that an expert witness might offer, such as descriptions of a defendant’s tendency to think in a certain way or his behavioral characteristics; the Arizona court made it clear that this sort of testimony was perfectly admissible to rebut the prosecution’s evidence of mens rea, 187 Ariz., at 544, 931 P. 2d, at 1054. Thus, only opinion testimony going to mental defect or disease, and its effect on the cognitive or moral capacities on which sanity depends under the Arizona rule, is restricted.
In this case, the trial court seems to have applied the Mott restriction to all evidence offered by Clark for the purpose of showing what he called his inability to form the required mens rea, see, e.g., Record, Doc. 406, at 7-10 (that is, an intent to kill a police officer on duty, or an understanding that he was engaging in the act of killing such an officer, see Ariz. Rev. Stat. Ann. § 13-1105(A)(3) (West Supp. 2005)). Thus, the trial court’s restriction may have covered not only mental-disease and capacity evidence as just defined, but also observation evidence offered by lay (and expert) witnesses who described Clark’s unusual behavior. Clark’s objection to the application of the Mott rule does not, however, turn *761 on the distinction between lay and expert witnesses or the kinds of testimony they were competent to present.[32]
C
There is some, albeit limited, disagreement between the dissent and ourselves about the scope of the claim of error properly before us. To start with matters of agreement, all Members of the Court agree that Clark’s general attack on the Mott rule covers its application in confining consideration of capacity evidence to the insanity defense.
In practical terms, our agreement on issues presented extends to a second point. Justice Kennedy understands that Clark raised an objection to confining mental-disease evidence to the insanity issue. As he sees it, Clark in effect claimed that in dealing with the issue of mens rea the trial judge should have considered expert testimony on what may characteristically go through the mind of a schizophrenic, when the judge considered what in fact was in Clark’s mind at the time of the shooting. See post, at 783 (dissenting opinion) (“[T]he opinion that Clark had paranoid schizophrenia—an opinion shared by experts for both the prosecution and defense—bears on efforts to determine, as a factual matter, whether he knew he was killing a police officer”). He thus understands that defense counsel claimed a right to rebut the State’s mens rea demonstration with testimony about how schizophrenics may hallucinate voices and other sounds, about their characteristic failure to distinguish the content of their imagination from what most people perceive as exterior reality, and so on. It is important to be clear that this supposed objection was not about dealing with tes *762 timony based on observation of Clark showing that he had auditory hallucinations when he was driving around, or failed in fact to appreciate objective reality when he shot; this objection went to use of testimony about schizophrenics, not about Clark in particular. While we might dispute how clearly Clark raised this objection, we have no doubt that the objection falls within a general challenge to the Mott rule; we understand that Mott is meant to confine to the insanity defense any consideration of characteristic behavior associated with mental disease, see 187 Ariz., at 544, 931 P. 2d, at 1054 (contrasting State v. Christensen, 129 Ariz. 32, 628 P. 2d 580 (1981), and State v. Gonzales, 140 Ariz. 349, 681 P. 2d 1368 (1984)). We will therefore assume for argument that Clark raised this claim, as we consider the due process challenge to the Mott rule.
The point on which we disagree with the dissent, however, is this: did Clark apprise the Arizona courts that he believed the trial judge had erroneously limited the consideration of observation evidence, whether from lay witnesses like Clark’s mother or (possibly) the expert witnesses who observed him? This sort of evidence was not covered by the Mott restriction, and confining it to the insanity issue would have been an erroneous application of Mott as a matter of Arizona law. For the following reasons we think no such objection was made in a way the Arizona courts could have understood it, and that no such issue is before us now. We think the only issue properly before us is the challenge to Mott on due process grounds, comprising objections to limits on the use of mental-disease and capacity evidence.
It is clear that the trial judge intended to apply Mott:
“[R]ecognizing that much of the evidence that [the defense is] going to be submitting, in fact all of it, as far as I know ... that has to do with the insanity could also arguably be made along the lines of the Mott issues as to form and intent and his capacity for the intent. I’m going to let you go ahead and get all that stuff in because *763 it goes to the insanity issue and because we’re not in front of a jury. At the end, I’ll let you make an offer of proof as to the intent, the Mott issues, but I still think the supreme court decision is the law of the land in this state.” App. 9.
At no point did the trial judge specify any particular evidence that he refused to consider on the mens rea issue. Nor did defense counsel specify any observation or other particular evidence that he claimed was admissible but wrongly excluded on the issue of mens rea, so as to produce a clearer ruling on what evidence was being restricted on the authority of Mott and what was not. He made no “offer of proof” in the trial court;[33] and although his brief in the Arizona Court of Appeals stated at one point that it was not inconsistent with Mott to consider nonexpert evidence indicating mental illness on the issue of mens rea, and argued that the trial judge had failed to do so, Appellant’s Opening Brief in No. 1CA-CR-03-0851 etc., pp. 48-49 (hereinafter Appellant’s Opening Brief), he was no more specific than that, see, e. g., id., at 52 (“The Court’s ruling in Mott and the trial court’s refusal to consider whether as a result of suffering from paranoid schizophrenia [Clark] could not formulate the mens rea necessary for first degree murder violated his right to due process”). Similarly, we read the Arizona Court of Appeals to have done nothing more than rely on Mott to reject the claim that due process forbids restricting evidence bearing on “[ajbility to [florm [m]ens [r]ea,” App. 351 (em *764 phasis in original), (i. e., mental-disease and capacity evidence) to the insanity determination. See id., at 351-353.
This failure in the state courts to raise any clear claim about observation evidence, see Appellant’s Opening Brief 46-52, is reflected in the material addressed to us, see Brief for Petitioner 13-32. In this Court both the question presented and the following statement of his position were couched in similarly worded general terms:
“I. ERIC WAS DENIED DUE PROCESS WHEN THE TRIAL COURT REFUSED TO CONSIDER EVIDENCE OF HIS SEVERE MENTAL ILLNESS IN DETERMINING FACTUALLY WHETHER THE PROSECUTION PROVED THE MENTAL ELEMENTS OF THE CRIME CHARGED.” Id., at 13.
But as his counsel made certain beyond doubt in his reply brief,
“Eric’s Point I is and always has been an attack on the rule of State v. Mott, which both courts below held applicable and binding. Mott announced a categorical ‘rejection of the use of psychological testimony to challenge the mens rea element of a crime,’ and upheld this rule against federal due process challenge.” Reply Brief for Petitioner 2 (citations omitted).
This explanation is supported by other statements in Clark’s briefs in both the State Court of Appeals and this Court, replete with the consistently maintained claim that it was error to limit evidence of mental illness and incapacity to its bearing on the insanity defense, excluding it from consideration on the element of mens rea. See, e. g., Appellant’s Opening Brief 46,47,51; Brief for Petitioner 11,13,16,20-23.
In sum, the trial court’s ruling, with its uncertain edges, may have restricted observation evidence admissible on mens rea to the insanity defense alone, but we cannot be *765 sure.[34] But because a due process challenge to such a restriction of observation evidence was, by our measure, neither pressed nor passed upon in the Arizona Court of Appeals, we do not consider it. See, e. g., Kentucky v. Stincer, 482 U. S. 730, 747, n. 22 (1987); Illinois v. Gates, 462 U. S. 213, 217-224 (1983). What we do know, and now consider, is Clark’s claim that Mott denied due process because it “preclude [dj Eric from contending that. . .factual inferences” of the “mental states which were necessary elements of the crime charged” “should not be drawn because the behavior was explainable, instead, as a manifestation of his chronic paranoid schizophrenia.” Brief for Petitioner 13 (emphasis in original). We consider the claim, as Clark otherwise puts it, that “Arizona’s prohibition of ‘diminished capacity’ evidence by criminal defendants violates” due process, ibid.
D
Clark’s argument that the Mott rule violates the Fourteenth Amendment guarantee of due process turns on the application of the presumption of innocence in criminal cases, the presumption of sanity, and the principle that a criminal defendant is entitled to present relevant and favorable evidence on an element of the offense charged against him.
*766 1
The first presumption is that a defendant is innocent unless and until the government proves beyond a reasonable doubt each element of the offense charged, see Patterson, 432 U. S., at 210-211; In re Winship, 397 U. S. 358, 361-364 (1970), including the mental element or mens rea. Before the last century, the mens rea required to be proven for particular offenses was often described in general terms like “malice,” see, e. g., In re Eckart, 166 U. S. 481 (1897); 4 W. Blackstone, Commentaries *21 (“[A]n unwarrantable act without a vicious will is no crime at all”), but the modern tendency has been toward more specific descriptions, as shown in the Arizona statute defining the murder charged against Clark: the State had to prove that in acting to kill the victim, Clark intended to kill a law enforcement officer on duty or knew that the victim was such an officer on duty. See generally Gardner, The Mens Rea Enigma: Observations on the Role of Motive in the Criminal Law Past and Present, 1993 Utah L. Rev. 635. As applied to mens rea (and every other element), the force of the presumption of innocence is measured by the force of the showing needed to overcome it, which is proof beyond a reasonable doubt that a defendant’s state of mind was in fact what the charge states. See Winship, supra, at 361-363.
2
The presumption of sanity is equally universal in some variety or other, being (at least) a presumption that a defendant has the capacity to form the mens rea necessary for a verdict of guilt and the consequent criminal responsibility. See Leland, 343 U. S., at 799; Davis v. United States, 160 U. S. 469, 486-487 (1895); M’Naghten’s Case, 10 Cl. & Fin., at 210, 8 Eng. Rep., at 722; see generally 1 LaFave, Substantive Criminal Law § 8.3(a), at 598-599, and n. 1. This presumption dispenses with a requirement on the government’s part *767 to include as an element of every criminal charge an allegation that the defendant had such a capacity.[35] The force of this presumption, like the presumption of innocence, is measured by the quantum of evidence necessary to overcome it; unlike the presumption of innocence, however, the force of the presumption of sanity varies across the many state and federal jurisdictions, and prior law has recognized considerable leeway on the part of the legislative branch in defining the presumption’s strength through the kind of evidence and degree of persuasiveness necessary to overcome it, see Fisher v. United States, 328 U. S. 463, 466-476 (1946).[36]
There are two points where the sanity or capacity presumption may be placed in issue. First, a State may allow a defendant to introduce (and a factfinder to consider) evidence of mental disease or incapacity for the bearing it can have on the government’s burden to show mens rea. See, e. g., State v. Perez, 882 A. 2d 574, 584 (R. I. 2005).[37] In such States the evidence showing incapacity to form the guilty state of mind, for example, qualifies the probative force of other evidence, which considered alone indicates that the defendant actually formed the guilty state of mind. If it is shown that a defendant with mental disease thinks all blond people are robots, he could not have intended to kill a person when he shot a man with blond hair, even though he seemed *768 to act like a man shooting another man.[38] In jurisdictions that allow mental-disease and capacity evidence to be considered on par with any other relevant evidence when deciding whether the prosecution has proven mens rea beyond a reasonable doubt, the evidence of mental disease or incapacity need only support what the factfinder regards as a reasonable doubt about the capacity to form (or the actual formation of) the mens rea, in order to require acquittal of the charge. Thus, in these States the strength of the presumption of sanity is no greater than the strength of the evidence of abnormal mental state that the factfinder thinks is enough to raise a reasonable doubt.
The second point where the force of the presumption of sanity may be tested is in the consideration of a defense of insanity raised by a defendant. Insanity rules like M’Naghten and the variants discussed in Part II, supra, are attempts to define, or at least to indicate, the kinds of mental differences that overcome the presumption of sanity or capacity and therefore excuse a defendant from customary criminal responsibility, see Jones v. United States, 463 U. S. 354, 373, n. 4 (1983) (Brennan, J., dissenting); D. Hermann, The Insanity Defense: Philosophical, Historical and Legal Perspectives 4 (1983) (“A central significance of the insanity defense . . . *769 is the separation of nonblameworthy from blameworthy offenders”), even if the prosecution has otherwise overcome the presumption of innocence by convincing the factfinder of all the elements charged beyond a reasonable doubt. The burden that must be carried by a defendant who raises the insanity issue, again, defines the strength of the sanity presumption. A State may provide, for example, that whenever the defendant raises a claim of insanity by some quantum of credible evidence, the presumption disappears and the government must prove sanity to a specified degree of certainty (whether beyond reasonable doubt or something less). See, e.g., Commonwealth v. Keita, 429 Mass. 843, 846, 712 N. E. 2d 65, 68 (1999). Or a jurisdiction may place the burden of persuasion on a defendant to prove insanity as the applicable law defines it, whether by a preponderance of the evidence or to some more convincing degree, see Ariz. Rev. Stat. Ann. § 13-502(C) (West 2001); Leland, 343 U. S., at 798. In any case, the defendant’s burden defines the presumption of sanity, whether that burden be to burst a bubble or to show something more.
3
The third principle implicated by Clark’s argument is a defendant’s right as a matter of simple due process to present evidence favorable to himself on an element that must be proven to convict him.[39] As already noted, evidence tending to show that a defendant suffers from mental disease and lacks capacity to form mens rea is relevant to rebut evidence that he did in fact form the required mens rea at the time in question; this is the reason that Clark claims a right to require the factfinder in this case to consider testimony *770 about his mental illness and his incapacity directly, when weighing the persuasiveness of other evidence tending to show mens rea, which the prosecution has the burden to prove.
As Clark recognizes, however, the right to introduce relevant evidence can be curtailed if there is a good reason for doing that. “While the Constitution ... prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.” Holmes v. South Carolina, 547 U. S. 319, 326 (2006); see Crane v. Kentucky, 476 U. S. 683, 689-690 (1986) (permitting exclusion of evidence that “poses an undue risk of ‘harassment, prejudice, [or] confusion of the issues’ ” (quoting Delaware v. Van Arsdall, 475 U. S. 673, 679 (1986))); see also Egelhoff, 518 U. S. 37; Chambers v. Mississippi, 410 U. S. 284, 302 (1973). And if evidence may be kept out entirely, its consideration may be subject to limitation, which Arizona claims the power to impose here. State law says that evidence of mental disease and incapacity may be introduced and considered, and if sufficiently forceful to satisfy the defendant’s burden of proof under the insanity rule it will displace the presumption of sanity and excuse from criminal responsibility. But mental-disease and capacity evidence may be considered only for its bearing on the insanity defense, and it will avail a defendant only if it is persuasive enough to satisfy the defendant’s burden as defined by the terms of that defense. The mental-disease and capacity evidence is thus being channeled or restricted to one issue and given effect only if the defendant carries the burden to convince the factfinder of insanity; the evidence is not being excluded entirely, and the question is whether reasons for requiring it to be channeled and restricted are good enough to *771 satisfy the standard of fundamental fairness that due process requires. We think they are.
E
1
The first reason supporting the Mott rule is Arizona’s authority to define its presumption of sanity (or capacity or responsibility) by choosing an insanity definition, as discussed in Part II, supra, and by placing the burden of persuasion on defendants who claim incapacity as an excuse from customary criminal responsibility. No one, certainly not Clark here, denies that a State may place a burden of persuasion on a defendant claiming insanity, see Leland, supra, at 797-799 (permitting a State, consistent with due process, to require the defendant to bear this burden). And Clark presses no objection to Arizona’s decision to require persuasion to a clear and convincing degree before the presumption of sanity and normal responsibility is overcome. See Brief for Petitioner 18, n. 25.
But if a State is to have this authority in practice as well as in theory, it must be able to deny a defendant the opportunity to displace the presumption of sanity more easily when addressing a different issue in the course of the criminal trial. Yet, as we have explained, just such an opportunity would be available if expert testimony of mental disease and incapacity could be considered for whatever a factfinder might think it was worth on the issue of mens rea.[40] As we mentioned, the presumption of sanity would then be only as strong as the evidence a factfinder would accept as enough to raise a reasonable doubt about mens rea for the crime charged; once reasonable doubt was found, acquittal would *772 be required, and the standards established for the defense of insanity would go by the boards.
Now, a State is of course free to accept such a possibility in its law. After all, it is free to define the insanity defense by treating the presumption of sanity as a bursting bubble, whose disappearance shifts the burden to the prosecution to prove sanity whenever a defendant presents any credible evidence of mental disease or incapacity. In States with this kind of insanity rule, the legislature may well be willing to allow such evidence to be considered on the mens rea element for whatever the factfinder thinks it is worth. What counts for due process, however, is simply that a State that wishes to avoid a second avenue for exploring capacity, less stringent for a defendant, has a good reason for confining the consideration of evidence of mental disease and incapacity to the insanity defense.
It is obvious that Arizona’s Mott rule reflects such a choice. The State Supreme Court pointed out that the State had declined to adopt a defense of diminished capacity (allowing a jury to decide when to excuse a defendant because of greater than normal difficulty in conforming to the law).[41] The court reasoned that the State’s choice would be undercut if evidence of incapacity could be considered for *773 whatever a jury might think sufficient to raise a reasonable doubt about mens rea, even if it did not show insanity. 187 Ariz., at 541, 931 P. 2d, at 1051. In other words, if a jury were free to decide how much evidence of mental disease and incapacity was enough to counter evidence of mens rea to the point of creating a reasonable doubt, that would in functional terms be analogous to allowing jurors to decide upon some degree of diminished capacity to obey the law, a degree set by them, that would prevail as a stand-alone defense.[42]
2
A State’s insistence on preserving its chosen standard of legal insanity cannot be the sole reason for a rule like Mott, however, for it fails to answer an objection the dissent makes in this case. See post, at 789-797 (opinion of Kennedy, J.). An insanity rule gives a defendant already found guilty the opportunity to excuse his conduct by showing he was insane when he acted, that is, that he did not have the mental capacity for conventional guilt and criminal responsibility. But, as the dissent argues, if the same evidence that affirmatively shows he was not guilty by reason of insanity (or “guilty except insane” under Arizona law, Ariz. Rev. Stat. Ann. § 13-502(A) (West 2001)) also shows it was at least doubtful that he could form mens rea, then he should not be found guilty in the first place; it thus violates due process when the State *774 impedes him from using mental-disease and capacity evidence directly to rebut the prosecution’s evidence that he did form mens rea.
Are there, then, characteristics of mental-disease and capacity evidence giving rise to risks that may reasonably be hedged by channeling the consideration of such evidence to the insanity issue on which, in States like Arizona, a defendant has the burden of persuasion? We think there are: in the controversial character of some categories of mental disease, in the potential of mental-disease evidence to mislead, and in the danger of according greater certainty to capacity evidence than experts claim for it.
To begin with, the diagnosis may mask vigorous debate within the profession about the very contours of the mental disease itself. See, e. g., American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders xxxiii (4th ed. text rev. 2000) (hereinafter DSM-IV-TR) (“DSM-IV reflects a consensus about the classification and diagnosis of mental disorders derived at the time of its initial publication. New knowledge generated by research or clinical experience will undoubtedly lead to an increased understanding of the disorders included in DSM-IV, to the identification of new disorders, and to the removal of some disorders in future classifications. The text and criteria sets included in DSM-IV will require reconsideration in light of evolving new information”); P. Caplan, They Say You’re Crazy: How the World’s Most Powerful Psychiatrists Decide Who’s Normal (1995) (criticism by former consultant to the DSM against some of the DSM’s categories). And Members of this Court have previously recognized that the end of such debate is not imminent. See Jones, 463 U. S., at 365, n. 13 (“ ‘The only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of judgment’ ” (quoting Greenwood v. United States, 350 U. S. 366, 375 (1956))); Powell v. Texas, 392 U. S. 514, 537 (1968) (plurality opinion) (“It *775 is simply not yet the time to write into the Constitution formulas cast in terms whose meaning, let alone relevance, is not yet clear ... to doctors”). Though we certainly do not “condem[n mental-disease evidence] wholesale,” Brief for American Psychiatric Association et al. as Amici Curiae 15, the consequence of this professional ferment is a general caution in treating psychological classifications as predicates for excusing otherwise criminal conduct.
Next, there is the potential of mental-disease evidence to mislead jurors (when they are the factfinders) through the power of this kind of evidence to suggest that a defendant suffering from a recognized mental disease lacks cognitive, moral, volitional, or other capacity, when that may not be a sound conclusion at all. Even when a category of mental disease is broadly accepted and the assignment of a defendant’s behavior to that category is uneontroversial, the classification may suggest something very significant about a defendant’s capacity, when in fact the classification tells us little or nothing about the ability of the defendant to form mens rea or to exercise the cognitive, moral, or volitional capacities that define legal sanity.[43] See DSM-IV-TR xxxii-xxxiii (“When the DSM-IV categories, criteria, and textual descriptions are employed for forensic purposes, there are significant risks that diagnostic information will be misused or misunderstood. These dangers arise because of the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis. In most situations, the clinical diagnosis of a DSM-IV mental disorder is not sufficient to establish the existence for legal *776 purposes of. . . ‘mental diseas[e]’ or ‘mental defect.’ In determining whether an individual meets a specified legal standard (e. g., for ... criminal responsibility ...), additional information is usually required beyond that contained in the DSM-IV diagnosis”). The limits of the utility of a professional disease diagnosis are evident in the dispute between the two testifying experts in this case; they agree that Clark was schizophrenic, but they come to opposite conclusions on whether the mental disease in his particular case left him bereft of cognitive or moral capacity. Evidence of mental disease, then, can easily mislead; it is very easy to slide from evidence that an individual with a professionally recognized mental disease is very different, into doubting that he has the capacity to form mens rea, whereas that doubt may not be justified. And of course, in the cases mentioned before, in which the categorization is doubtful or the category of mental disease is itself subject to controversy, the risks are even greater that opinions about mental disease may confuse a jury into thinking the opinions show more than they do. Because allowing mental-disease evidence on mens rea can thus easily mislead, it is not unreasonable to address that tendency by confining consideration of this kind of evidence to insanity, on which a defendant may be assigned the burden of persuasion.
There are, finally, particular risks inherent in the opinions of the experts who supplement the mental-disease classifications with opinions on incapacity: on whether the mental disease rendered a particular defendant incapable of the cognition necessary for moral judgment or mens rea or otherwise incapable of understanding the wrongfulness of the conduct charged. Unlike observational evidence bearing on mens rea, capacity evidence consists of judgment, and judgment fraught with multiple perils: a defendant’s state of mind at the crucial moment can be elusive no matter how conscientious the enquiry, and the law’s categories that set the terms of the capacity judgment are not the categories of psychology *777 that govern the expert’s professional thinking. Although such capacity judgments may be given in the utmost good faith, their potentially tenuous character is indicated by the candor of the defense expert in this very case. Contrary to the State’s expert, he testified that Clark lacked the capacity to appreciate the circumstances realistically and to understand the wrongfulness of what he was doing, App. 48-49, but he said that “no one knows exactly what was on [his] mind” at the time of the shooting, id., at 48. And even when an expert is confident that his understanding of the mind is reliable, judgment addressing the basic categories of capacity requires a leap from the concepts of psychology, which are devised for thinking about treatment, to the concepts of legal sanity, which are devised for thinking about criminal responsibility. See Insanity Defense Work Group, American Psychiatric Association Statement on the Insanity Defense, 140 Am. J. Psychiatry 681,686 (1983), reprinted in 2 The Role of Mental Illness in Criminal Trials 117,122 (J. Moriarty ed. 2001) (“The American Psychiatric Association is not opposed to legislatures restricting psychiatric testimony about the... ultimate legal issues concerning the insanity defense. . . . When . . . ‘ultimate issue’ questions are formulated by the law and put to the expert witness who must then say ‘yea’ or ‘nay,’ then the expert witness is required to make a leap in logic. He no longer addresses himself to medical concepts but instead must infer or intuit what is in fact unspeakable, namely, the probable relationship between medical concepts and legal or moral constructs such as free will. These impermissible leaps in logic made by expert witnesses confuse the jury. . . . This state of affairs does considerable injustice to psychiatry and, we believe, possibly to criminal defendants. These psychiatric disagreements . . . cause less than fully understanding juries or the public to conclude that psychiatrists cannot agree. In fact, in many criminal insanity trials both prosecution and defense psychiatrists do agree about the nature and even the extent of mental disorder ex *778 hibited by the defendant at the time of the act” (emphasis in original; footnote omitted)); DSM-IV-TR xxxii-xxxiii; R Giannelli & E. Imwinkelried, Scientific Evidence §9-3(B), p. 286 (1986) (“[N]o matter how the test for insanity is phrased, a psychiatrist or psychologist is no more qualified than any other person to give an opinion about whether a particular defendant’s mental condition satisfies the legal test for insanity”); cf. R. Slovenko, Psychiatry and Criminal Culpability 55 (1995) (“The scope of the DSM is wide-ranging and includes ‘conduct disorders’ but ‘evil’ is not mentioned”). In sum, these empirical and conceptual problems add up to a real risk that an expert’s judgment in giving capacity evidence will come with an apparent authority that psychologists and psychiatrists do not claim to have. We think that this risk, like the difficulty in assessing the significance of mental-disease evidence, supports the State’s decision to channel such expert testimony to consideration on the insanity defense, on which the party seeking the benefit of this evidence has the burden of persuasion.
It bears repeating that not every State will find it worthwhile to make the judgment Arizona has made, and the choices the States do make about dealing with the risks posed by mental-disease and capacity evidence will reflect their varying assessments about the presumption of. sanity as expressed in choices of insanity rules.[44] The point here simply is that Arizona has sensible reasons to assign the risks as it has done by channeling the evidence.[45]
*779 F
Arizona’s rule serves to preserve the State’s chosen standard for recognizing insanity as a defense and to avoid confusion and misunderstanding on the part of jurors.[46] For these reasons, there is no violation of due process under Chambers and its progeny, and no cause to claim that channeling evidence on mental disease and capacity offends any “‘principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,’ ” Patterson, 432 U. S., at 202 (quoting Speiser, 357 U. S., at 523).
* * *
The judgment of the Court of Appeals of Arizona is, accordingly, affirmed.

It is so ordered.

 Section 13-1105(A)(3) provides that “[a] person commits first degree murder if. .. [intending or knowing that the person’s conduct will cause death to a law enforcement officer, the person causes the death of a law enforcement officer who is in the line of duty.”

 Section 13-502(A) provides in full that
“A person may be found guilty except insane if at the time of the commission of the criminal act the person was afflicted with a mental disease or defect of such severity that the person did not know the criminal act was wrong. A mental disease or defect constituting legal insanity is an affirmative defense. Mental disease or defect does not include disorders that result from acute voluntary intoxication or withdrawal from alcohol or drugs, character defects, psyehosexual disorders or impulse control disorders. Conditions that do not constitute legal insanity include but are not limited to momentary, temporary conditions arising from the pressure of the circumstances, moral decadence, depravity or passion growing out of anger, jealousy, revenge, hatred or other motives in a person who does not suffer from a mental disease or defect or an abnormality that is manifested only by criminal conduct.”
A defendant found “guilty except insane” is committed to a state mental-health facility for treatment. See § 13-502(D).

 The trial court permitted Clark to introduce this evidence, whether primarily going to insanity or lack of intent, “because it goes to the insanity issue and because we’re not in front of a jury.” App. 9. It also allowed him to make an offer of proof as to intent to preserve the issue on appeal. Ibid.

 Clark did not at this time make an additional offer of proof, as contemplated by the trial court when it ruled that it would consider evidence bearing on insanity as to insanity but not as to mens rea. See n. 3, supra.

 This statutory standard followed the Arizona Supreme Court’s declaration that Arizona has “uniformly adhered” to the two-part M’Naghten standard. State v. Schantz, 98 Ariz. 200, 206, 403 P. 2d 521, 525 (1965) (citing cases), cert. denied, 382 U. S. 1015 (1966).

 This change was accompanied by others, principally an enumeration of mental states excluded from the category of “mental disease or defect,” such as voluntary intoxication and other conditions, and a change of the insanity verdict from “not responsible for criminal conduct” by reason of insanity to “guilty except insane.” See 1993 Ariz. Sess. Laws ch. 256, §§2-3. The 1993 amendments were prompted, at least in part, by an acquittal by reason of insanity in a murder case. See Note, Arizona’s Insane Response to Insanity, 40 Ariz. L. Rev. 287, 290 (1998).

 “Capacity” is understood to mean the ability to form a certain state of mind or motive, understand or evaluate one’s actions, or control them.

 See Queen v. Oxford, 9 Car. & P. 525, 546, 173 Eng. Rep. 941, 950 (1840) (“If some controlling disease was, in truth, the acting power within [the defendant] which he could not resist, then he will not be responsible”); Hadfield’s Case, 27 How. St. Tr. 1281, 1314-1315, 1354-1355 (K. B. 1800). But cf. Queen v. Burton, 3 F. & F. 772, 780, 176 Eng. Rep. 354, 357 (1863) (rejecting the irresistible-impulse test as “a most dangerous doctrine”).

 E. g., Parsons v. State, 81 Ala. 577, 2 So. 854 (1887); State v. Thompson, Wright’s Ohio Rep. 617 (1834).

 State v. Jones, 50 N. H. 369 (1871); State v. Pike, 49 N. H. 399 (1870).

 This distillation of the Anglo-American insanity standards into combinations of four building blocks should not be read to signify that no other components contribute to these insanity standards or that there are no material distinctions between jurisdictions testing insanity with the same building blocks. For example, the jurisdictions limit, in varying degrees, which sorts of mental illness or defect can give rise to a successful insanity defense. Compare, e. g., Ariz. Rev. Stat. Ann. § 13-502(A) (West 2001) (excluding from definition of “mental disease or defect” acute voluntary intoxication, withdrawal from alcohol or drugs, character defects, psycho-sexual disorders, and impulse control disorders) with, e. g., Ind. Code §35-41—3—6(b) (West 2004) (excluding from definition of “mental disease or defect” “abnormality manifested only by repeated unlawful or antisocial conduct”). We need not compare the standards under a finer lens because our coarser analysis shows that the standards vary significantly.

 See 18 U. S.C. § 17; Ala. Code § 13A-3-1 (1994); Cal. Penal Code Ann. §25 (West 1999); Colo. Rev. Stat. Ann. §16-8-101.5 (2005); Fla. Stat. §775.027 (2003); Iowa Code §701.4 (2005); Minn. Stat. §611.026 (2004); Stevens v. State, 806 So. 2d 1031, 1050-1051 (Miss. 2001); Mo. Rev. Stat. §562.086 (2000); State v. Harms, 263 Neb. 814, 836-837, 643 N. W. 2d 359, 378-379 (2002); Nev. Rev. Stat. § 194.010 (2004); Finger v. State, 117 Nev. 548, 553-577, 27 P. 3d 66, 70-85 (2001); N. J. Stat. Ann. §2C:4-1 (West 2005); N. Y. Penal Law Ann. § 40.15 (West 2004); State v. Thompson, 328 N. C. 477, 485-486, 402 S. E. 2d 386, 390 (1991); Burrows v. State, 640 P. 2d 533, 540-541 (Okla. Crim. App. 1982) (interpreting statutory language excusing from criminal responsibility mentally ill defendants when “at the time of committing the act charged against them they were incapable of knowing its wrongfulness,” Okla. Stat., Tit. 21, § 152(4) (West 2001), to mean the two-part M’Naghten test); 18 Pa. Cons. Stat. §315 (2002); Tenn. Code Ann. § 39-11-501 (2003); Wash. Rev. Code § 9A.12.010 (2004). North Dakota has a unique test, which appears to be a modified version of M’Naghten, asking whether a defendant “lacks substantial capacity to comprehend the harmful nature or consequences of the conduct, or the conduct is the result of a loss or serious distortion of the individual’s capacity to recognize reality,” N. D. Cent. Code Ann. § 12.1-04.1-01(l)(a) (Lexis 1997), when “[i]t is an essential element of the crime charged that the individual act willfully,” § 12.1-04.1-01(l)(b).

 Alaska Stat. § 12.47.010 (2004).

 Ariz. Rev. Stat. Ann. §13-502 (West 2001); Del. Code Ann., Tit. 11, §401 (1995); Ind. Code §35-41-3-6 (West 2004); Ill. Comp. Stat., ch. 720, § 5/6-2 (West 2004); La. Stat. Ann. § 14:14 (West 1997); Me. Rev. Stat. Ann., Tit. 17-A, §39 (2006); Ohio Rev. Code Ann. §2901.01(A)(14) (Lexis 2006); S. C. Code Ann. §17-24-10 (2003); S. D. Codified Laws §22-1-2(20) (2005 Supp. Pamphlet); Tex. Penal Code Ann. §8.01 (West 2003).

 ALI, Model Penal Code §4.01(1), p. 66 (Proposed Official Draft 1962) (“A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law”).

 Ark. Code Ann. §5-2-312 (2006); Conn. Gen. Stat. §53a-13 (2005); Malede v. United States, 767 A. 2d 267, 269 (D. C. 2001); Ga. Code Ann. §§16-3-2, 16-3-3 (2003); Haw. Rev. Stat. §704-400 (1993); Ky. Rev. Stat. Ann. §504.020 (West 2003); Md. Crim. Proc. Code Ann. §3-109 (Lexis 2001); Commonwealth v. McLaughlin, 431 Mass. 506, 508, 729 N. E. 2d 252, 255 (2000); Ore. Rev. Stat. §161.295 (2003); State v. Martinez, 651 A. 2d 1189, 1193 (R. 1.1994); Vt. Stat. Ann., Tit. 13, §4801 (1998); State v. Lockhart, 208 W. Va. 622, 630, 542 S. E. 2d 443, 451 (2000); Wis. Stat. §971.15 (2003-2004); Wyo. Stat. Ann. §7-11-304 (2005).

 Mich. Comp. Laws Ann. § 768.21a (West 2000); State v. Hartley, 90 N. M. 488, 490-491, 565 P. 2d 658, 660-661 (1977); Bennett v. Commonwealth, 29 Va. App. 261, 277, 511 S. E. 2d 439, 446-447 (1999).

 State v. Plante, 134 N. H. 456, 461, 594 A. 2d 1279, 1283 (1991).

 See, e. g., Alaska Stat. §§ 12.47.020(c), 12.47.030 (2004); Del. Code Ann., Tit. 11, §401 (1995); Ga. Code Ann. §17-7-131 (2004); Ill. Comp. Stat., ch. 720, § 5/6-2 (West 2004); Ind. Code §§35-35-2-1, 35-36-1-1, 35-36-2-3 (West 2004); Ky. Rev. Stat. Ann. § 504.130 (West 2003); Mich. Comp. Laws Ann. §768.36 (West Supp. 2006); N. M. Stat. Ann. §31-9-3 (2000); 18 Pa. Cons. Stat. §314 (2002); S. C. Code Ann. §17-24-20 (2003); S. D. Codified Laws §23A-26-14 (2004). Usually, a defendant found “guilty but mentally ill” will receive mental-health treatment until his mental health has rebounded, at which point he must serve the remainder of his imposed sentence. See, e. g., Alaska Stat. § 12.47.050 (2004).

 Idaho Code §18-207 (Lexis 2004); Kan. Stat. Ann. §22-3220 (1995); Mont. Code Ann. §§46-14-102, 46-14-311 (2005); Utah Code Ann. § 76-2-305 (Lexis 2003). We have never held that the Constitution mandates an insanity defense, nor have we held that the Constitution does not so require. This case does not call upon us to decide the matter.

 §§77-16a-101, 77-16a-103, 77-16a-104 (Lexis 2003).

 See statutes cited in n. 20, supra.

 He might, of course, have thought delusively he was doing something just as wrongful as the act charged against him, but this is not the test: he must have understood that he was committing the act charged and that it was wrongful, see Ariz. Rev. Stat. Ann. §13-502(A) (West 2001) (“A person may be found guilty except insane if at the time of the commission of the criminal act the person was afflicted with a mental disease or defect of such severity that the person did not know the criminal act was wrong”).

 We think this logic holds true in the face of the usual rule of statutory construction of “ ‘ “giv[ing] effect, if possible, to every clause and word of a statute,’”” Duncan v. Walker, 533 U. S. 167, 174 (2001) (quoting United States v. Menasche, 348 U. S. 528, 538-539 (1955)); see also 2 J. Sutherland, Statutes and Statutory Construction § 4705 (3d ed. 1943). Insanity standards are formulated to guide the factfinder to determine the blameworthiness of a mentally ill defendant. See, e. g., Jones v. United States, 463 U. S. 354, 373, n. 4 (1983) (Brennan, J., dissenting). The M’Naghten test is a sequential test, first asking the factfinder to conduct the easier enquiry whether a defendant knew the nature and quality of his actions. If not, the defendant is to be considered insane and there is no need to pass to the harder and broader enquiry whether the defendant knew his actions were wrong. And, because, owing to this sequence, the factfinder is to ask whether a defendant lacks moral capacity only when he possesses cognitive capacity, the only defendants who will be found to lack moral capacity are those possessing cognitive capacity. Cf. 2 C. Torcía, Wharton’s Criminal Law § 101 (15th ed. 1994). Though, before 1993, Arizona had in place the full M’Naghten test with this sequential enquiry, see, e. g., Schantz, 98 Ariz., at 207, 403 P. 2d, at 525, it would appear that the legislature eliminated the cognitive capacity part not to change the meaning of the insanity standard but to implement its judgment that a streamlined standard with only the moral capacity part would be easier for the jury to apply, see Arizona House of Representatives, Judiciary Committee Notes 3 (Mar. 18,1993); 1 R. Gerber, Criminal Law of Arizona 502-6, 502-11 (2d ed. 1993 and Supp. 2000). This is corroborated by the State’s choice for many years against revising the applicable recommended jury instruction (enumerating the complete M’Naghten test) in order to match the amended statutory standard. See 1 Gerber, supra, at 502-6 (2d ed. 1993 and Supp. 2000).

 We thus think the dissent reads Mott too broadly. See post, at 786 (opinion of Kennedy, J.) (no distinction between observation and mental-disease testimony, see infra, at 757-758, or lay and expert).

 The more natural reading of Mott suggests to us that this evidence cannot be considered as to mens rea even if the defendant establishes his insanity, though one might read Mott otherwise.

 Clark’s parents testified that, in the months before the shooting and even days beforehand, Clark called them “aliens” and thought that “aliens” were out to get him. See, e. g., Tr. of Bench Trial in No. CR 2000-538, pp. 110-112, 136, 226-228 (Aug. 20, 2003). One night before the shooting, according to Clark’s mother, Clark repeatedly viewed a popular film characterized by her as telling a story about “aliens” masquerading as government agents, a story Clark insisted was real despite his mother’s protestations to the contrary. See id., at 59-60 (Aug. 21, 2003). And two months after the shooting, Clark purportedly told his parents that his hometown, Flagstaff, was inhabited principally by “aliens,” who had to be stopped, and that the only way to stop them was with bullets. See, e. g., id., at 131-132 (Aug. 20, 2003); id., at 24-25 (Aug. 21, 2003).

 This is contrary to the dissent’s understanding. See post, at 782-783 (opinion of Kennedy, J.).

 In conflict with the dissent’s characterization, see post, at 782 (opinion of Kennedy, J.), it does not always, however, come from experts.

 Arizona permits capacity evidence, see, e.g., State v. Sanchez, 117 Ariz. 369, 373, 573 P. 2d 60, 64 (1977); see also Ariz. Rule Evid. 704 (2006) (allowing otherwise admissible" evidence on testimony “embrac[ing] an ultimate issue to be decided by the trier of fact”), though not every jurisdiction permits such evidence on the ultimate issue of insanity. See, e. g., Fed. Rule Evid. 704(b) (“No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone”); United States v. Dixon, 185 F. 3d 393, 400 (CA5 1999) (in the *759 face of mental-disease evidence, Rule 704(b) prohibits an expert “from testifying that [the mental-disease evidence] does or does not prevent the defendant from appreciating the wrongfulness of his actions”).

 Arizona permits evidence bearing on insanity to be presented by either lay or expert witnesses. See State v. Bay, 150 Ariz. 112, 116, 722 R 2d 280, 284 (1986). According to Bay, “[fjoundationally, a lay witness must have had an opportunity to observe the past conduct and history of a defendant; the fact that he is a lay witness goes not to the admissibility of the testimony but rather to its weight.” Ibid, (citation omitted); see also State v. Hughes, 193 Ariz. 72, 83, 969 R 2d 1184, 1195 (1998). In fact, a defendant can theoretically establish insanity solely via lay testimony. See Bay, supra, at 116, 722 P. 2d, at 284. But cf. State v. McMurtrey, 136 Ariz. 93, 100, 664 P. 2d 637, 644 (1983) (“[I]t is difficult to imagine how a defendant could place his or her sanity in issue . . . without expert testimony as to the defendant’s state of mind at the time of the crime”).

 With respect to “the limited factual issues the trial court held it could consider under [Ariz. Rev. Stat. Ann.] § 13-502 and Mott, defense counsel made no additional ‘offer of proof’ at the conclusion of the case but preserved [Clark’s] legal contentions by asking the court to consider all of the evidence presented in determining whether the state had proved its case.” Brief for Petitioner 10, n. 20 (citation omitted).

 We do not agree with the State’s argument that the failure to make an offer of proof, see n. 4, supra, is a bar to pressing Clark’s claim about the admissibility of mental-illness or capacity evidence as to mens rea, see Brief for Respondent 27-29, especially when the Arizona Court of Appeals rejected Clark’s argument on the merits rather than clearly on this ground, see App. 351-353; see also Michigan v. Long, 463 U. S. 1032, 1042 (1983) (“[I]t is not clear from the opinion itself that the state court relied upon an adequate and independent state ground and ... it fairly appears that the state court rested its decision primarily on federal law”).

 We therefore have no reason to believe that the courts of Arizona would have failed to restrict their application of Mott to the professional testimony the Mott opinion was stated to cover, if Clark’s counsel had specified any observation evidence he claimed to be generally admissible and relevant to mens rea. Nothing that we hold here is authority for restricting a factfinder’s consideration of observation evidence indicating state of mind at the time of a criminal offense (conventional mens rea evidence) as distinct from professional mental-disease or capacity evidence going to ability to form a certain state of mind during a period that includes the time of the offense charged. And, of course, nothing held here prevents Clark from raising this discrete claim when the case returns to the courts of Arizona, if consistent with the State’s procedural rules.

 A legislature is nonetheless free to require affirmative proof of sanity by the way it describes a criminal offense, see Dixon v. United States, ante, at 9-12.

 Although a desired evidentiary use is restricted, that is not equivalent to a Sandstrom presumption. See Sandstrom v. Montana, 442 U. S. 510, 514-524 (1979) (due process forbids use of presumption that relieves the prosecution of burden of proving mental state by inference of intent from an act).

 In fact, Oregon had this scheme in place when we decided Leland v. Oregon, 343 U. S. 790, 794-796 (1952). We do not, however, read any part of Leland to require as a matter of due process that evidence of incapacity be considered to rebut the mens rea element of a crime.

 We reject the State’s argument that mens rea and insanity, as currently understood, are entirely distinguishable, so that mental-disease and capacity evidence relevant to insanity is simply irrelevant to mens rea. Not only does evidence accepted as showing insanity trump mens rea, but evidence of behavior close to the time of the act charged may indicate both the actual state of mind at that time and also an enduring incapacity to form the criminal state of mind necessary to the offense charged. See Brief for American Psychiatric Association et al. as Amici Curiae 12-13; Arenella, The Diminished Capacity and Diminished Responsibility Defenses: Two Children of a Doomed Marriage, 77 Colum. L. Rev. 827, 834-835 (1977); cf. Powell v. Texas, 392 U. S. 514, 535-536 (1968) (plurality opinion) (the “doctrines of actus reus, mens rea, insanity, mistake, justification, and duress” are a “collection of interlocking and overlapping concepts which the common law has utilized to assess the moral accountability of an individual for his antisocial deeds”).

 Clark’s argument assumes that Arizona’s rule is a rule of evidence, rather than a redefinition of mens rea, see Montana v. Egelhoff, 518 U. S. 37, 58-59 (1996) (Ginsburg, J., concurring in judgment); id., at 71 (O’Con-nor, J., dissenting). We have no reason to view the rule otherwise, and on this assumption, it does not violate due process, see infra, at 773-779.

 Cf. post, at 783 (Kennedy, J., dissenting) (“The psychiatrist’s explanation of Clark’s condition was essential to understanding how he processes sensory data and therefore to deciding what information was in his mind at the time of the shooting. Simply put, knowledge relies on cognition, and cognition can be affected by schizophrenia”).

 Though the term “diminished capacity” has been given different meanings, see, e. g., Morse, Undiminished Confusion in Diminished Capacity, 75 J. Crim. L. & C. 1 (1984) (“The diminished capacity doctrine allows a criminal defendant to introduce evidence of mental abnormality at trial either to negate a mental element of the crime charged, thereby exonerating the defendant of that charge, or to reduce the degree of crime for which the defendant may be convicted, even if the defendant’s conduct satisfied all the formal elements of a higher offense”), California, a jurisdiction with which the concept has traditionally been associated, understood it to be simply a “ ‘showing that the defendant’s mental capacity was reduced by mental illness, mental defect or intoxication,’ ” People v. Berry, 18 Cal. 3d 509, 517, 556 P. 2d 777, 781 (1976) (quoting People v. Castillo, 70 Cal. 2d 264, 270, 449 P. 2d 449, 452 (1969); emphasis deleted), abrogated by Cal. Penal Code Ann. §§ 25(a), 28(a)-(b), 29 (West 1999 and Supp. 2006).

 It is beyond question that Arizona may preclude such a defense, see Fisher v. United States, 328 U. S. 463, 466-476 (1946), and there is no doubt that the Arizona Legislature meant to do so, see Ariz. Rev. Stat. Ann. § 13-502(A) (West 2001) (“Mental disease or defect does not include disorders that result from acute voluntary intoxication or withdrawal from alcohol or drugs, character defects, psychosexual disorders or impulse control disorders. Conditions that do not constitute legal insanity include but are not limited to momentary, temporary conditions arising from the pressure of the circumstances, moral decadence, depravity or passion growing out of anger, jealousy, revenge, hatred or other motives in a person who does not suffer from .a mental disease or defect or an abnormality that is manifested only by criminal conduct”).

 Our observation about the impact of mental-disease evidence on understandings of capacity in no way undermines the assertion by the American Psychiatric Association, the American Psychological Association, and the American Academy of Psychiatry in this case that “[ejxpert evidence of mental disorders . . . is . . . relevant to the mental-state issues raised by mens rea requirements,” Brief for American Psychiatric Association et al. as Amici Curiae 15.

 A State in which the burden of persuasion as to a defendant’s sanity lies with the prosecution might also be justified in restricting mental-disease and capacity evidence to insanity determinations owing to the potential of mental-disease evidence to mislead and the risk of misjudgment inherent in capacity evidence. We need not, in the context of this case, address that issue.

 Arizona’s rule is supported by a further practical reason, though not as weighty as those just considered. As mentioned before, if substantial mental-disease and capacity evidence is accepted as rebutting mens rea in a given case, the .affirmative defense of insanity will probably not be *779 reached or ruled upon; the defendant will simply be acquitted (or perhaps convicted of a lesser included offense). If an acquitted defendant suffers from a mental disease or defect that makes him dangerous, he will neither be confined nor treated psyehiatrically unless a judge so orders after some independent commitment proceeding. But if a defendant succeeds in showing himself insane, Arizona law (and presumably that of every other State with an insanity rule) will require commitment and treatment as a consequence of that finding without more. It makes sense, then, to channel capacity evidence to the issue structured to deal with mental incapacity when such a claim is raised successfully. See, e. g., Jones, 463 U. S., at 368 (“The purpose of commitment following an insanity acquittal... is to treat the individual’s mental illness and protect him and society from his potential dangerousness”).

 The rule also deals in a practical way with those whose insanity has been shown to make them dangerous to others. See 01.-45, supra.