# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 14-70033

United States Court of Appeals
Fifth Circuit

**FILED**

May 27, 2015

Lyle W. Cayce
Clerk

ROBERT LESLIE ROBERSON, III,

Petitioner - Appellant

v.

WILLIAM STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 2:09-CV-327

Before KING, JOLLY, and HAYNES, Circuit Judges.

PER CURIAM:*

Petitioner-Appellant Robert Leslie Roberson, III, seeks a certificate of
appealability from this court to appeal the district court's denial of his petition
for a writ of habeas corpus. Because we conclude that reasonable jurists would
not debate the correctness of the district court's disposition of Issues One and
Two, we DENY Roberson's application for a certificate of appealability as to

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH
CIR. R. 47.5.4.

No. 14-70033

those issues.  We conclude that reasonable jurists would debate the correctness of the district court's disposition of Issue Three, and we GRANT Roberson's application as to that issue.

I.

On January 31, 2002, Nikki Curtis was brought into the emergency room in Palestine, Texas.  She was not breathing and had a blue color to her skin.  Despite the efforts of the medical providers in Palestine and, later, in Dallas, Nikki succumbed to her injuries and passed away later that day.  She was two years old.

Nikki was the daughter of the Petitioner-Appellant, Robert Roberson.  After a custody battle, Nikki had come to live with Roberson and his girlfriend, Teddie Cox.  Cox's daughter, Rachel, also lived with them.  The week of Nikki's death, Cox was admitted to the hospital for a hysterectomy and had to stay overnight.  Nikki's maternal grandparents, the Bowmans, babysat Nikki while Cox was in the hospital, as Cox did not want to leave Nikki alone with Roberson.  On January 30, however, Mrs. Bowman became ill, and she asked to have Roberson come pick up Nikki.  Cox testified that Roberson was mad that he had to go get Nikki, but eventually did so.

The next morning, Cox called Roberson to tell him that she had been discharged from the hospital and to ask him to pick her up.  Roberson told Cox over the phone that he thought he needed to come to the hospital anyway, as Nikki was not breathing.  Cox implored him to take Nikki to the hospital immediately.

When Roberson arrived, Cox, who was in a wheelchair, took Nikki in her lap and they went to the emergency room.  The nurses in the emergency room immediately began lifesaving measures.  It quickly became apparent to medical staff by the nature of Nikki's injuries that something was amiss, and they called the police.  A nurse specializing in sexual assault examinations,

2

No. 14-70033

Andrea Sims, examined Nikki and noted injuries consistent with sexual assault, namely three tears on Nikki's anus and abnormal rectal laxity. The CT scan performed at the hospital showed severe trauma to Nikki's brain, and her doctors concluded that she needed to be transported to Children's Medical Center in Dallas for further care. Nikki passed away in Dallas.

Roberson was indicted for capital murder on April 25, 2002. Roberson was charged with two manner and means of committing the offense of capital murder: murder committed during the course of committing or attempting to commit aggravated sexual assault and murder of a child under the age of six years.[1] The Texas Court of Criminal Appeals summarized the testimony at trial in its opinion on direct appeal:

> The State called twelve witnesses during its case-in-chief. Among them was Kelly Gurganus, a registered nurse, who testified that she was working in the emergency room of the Palestine Regional Medical Center when [Roberson] came in, pushing a wheelchair in which sat his girlfriend Teddie Cox. Gurganus said Teddie was holding something in her lap, covered in a blanket or coat of some sort. Teddie told Gurganus, "She's not breathing," at which point Gurganus removed the covering and saw Nikki Curtis lying in Teddie's lap, limp and blue. Gurganus described Nikki as being like a rag doll, and said that in her five years of nursing she had never seen anyone appear that shade of blue, not even a drowning victim. Gurganus immediately took Nikki to a trauma room and called a doctor.
>
> Gurganus further testified that when she laid Nikki down on the bed in the trauma room, she saw bruising on Nikki's body, including on her head. She said that she then spoke with [Roberson] and asked him what happened, and that he told her that Nikki's injuries were the result of falling off of the bed. She said she immediately became suspicious because that story seemed implausible in light of the severity of Nikki's injuries. She instructed the director of nurses to call the police.

---

[1] The capital murder statute has since been amended to include murder of a child under ten years old. Tex. Penal Code § 19.03(a)(8).

No. 14-70033

Gurganus spoke again with [Roberson] and said that he appeared nervous and anxious. She also said that he never once asked her about Nikki's condition, and that he was not crying. She said that she attempted to speak with Nikki's maternal grandparents, who had also come to the hospital, but that [Roberson] prevented her from doing so. That was the extent of her conversation with [Roberson], except that he did approach her at some point later to say he loved his daughter and that he would never mean to hurt her. The State also called Robbin Odem, the chief nursing officer at Palestine Regional Medical Center, who testified to her own observations of Nikki's extensive head injuries, as well as her similar interaction with, and impression of, [Roberson] in the emergency room that night.

*Roberson v. State*, No. AP-74671, 2002 WL 34217382, at *1 (Tex. Crim. App. June 20, 2007) (unpublished). Next, the state called Andrea Sims, who testified in detail as to the results of her sexual assault examination and her conclusion that Nikki was likely sexually assaulted. The state then called Brian Wharton, one of the police officers who investigated Nikki's death. Wharton testified that Roberson told him that Nikki had hurt herself by falling out of the bed. Wharton searched Roberson's house with Roberson present and recovered a bloody wash rag and found blood on a pillow. Other than those two items, Wharton testified that they found no evidence indicating a violent struggle. The state's case continued with the testimony of one of Nikki's physicians:

Dr. John Ross, the pediatrician who examined Nikki the day she died, testified that she had bruising on her chin, as well as along her left cheek and jaw. Dr. Ross said she also had a large subdural hematoma, which he described as "bleeding outside the brain, but inside the skull." He said there was edema on the brain tissue, and that her brain had actually shifted from the right side to the left. He said that, in his opinion, Nikki's injuries were not accidental but instead intentionally inflicted.

Dr. Thomas Konjoyan, the emergency room physician who treated Nikki the day she died, also testified that she had bruising on the left side of her jaw, and that she had uncal herniation, which is "essentially a precursor to brain death." Dr. Konjoyan said that

the severity of the swelling in Nikki's brain necessitated her transfer to the Children's Medical Center in Dallas for pediatric neurosurgical services. He said that, in his opinion, it would be "basically impossible" for such an injury to have resulted from a fall out of bed. Dr. Jill Urban, a forensic pathologist for Dallas County, testified for the State that she performed the autopsy on Nikki and concluded that Nikki died as a result of "blunt force head injuries."

The jury also heard from Courtney Berryhill, Teddie Cox's eleven-year-old niece, who testified that sometimes she spent the night at the home where [Roberson] lived with Teddie, Nikki, and Teddie's ten-year-old daughter Rachel Cox. Courtney said that she once witnessed [Roberson] shake Nikki by the arms in an attempt to make her stop crying. Rachel Cox then testified that [Roberson] had a "bad temper," and that she had witnessed him shake and spank Nikki when she was crying. Rachel said she had seen this happen about ten times. She also recalled a time that [Roberson] threatened to kill Nikki.

*Id.* at *2. Dr. Janet Squires, a pediatrician who treated Nikki at Children's Medical Center in Dallas, also testified for the state. Dr. Squires testified that the act that caused Nikki's injuries was a "very violent forceful act," an act "that any reasonable person would realize is not normal," and that Nikki was the victim of "non-accidental inflicted trauma." Dr. Squires, who was also the primary physician with Children's Medical Center's child abuse unit, testified that she observed only one small laceration on Nikki's anus and that rectal laxity means very little in a totally comatose child. As such, Dr. Squires testified that she was not prepared to conclude one way or the other whether Nikki had been sexually abused. The state then called Teddie Cox:

Teddie said that, although Nikki was not her biological child, she loved Nikki as her own. At the time she moved in with [Roberson], Nikki was living with her maternal grandparents, the Bowmans. Teddie said that [Roberson] had no interest in gaining custody of Nikki but did so only because Teddie wanted to care for Nikki, and so she—along with [Roberson]'s mother—prodded [Roberson] to seek custody of Nikki. They did, and Nikki came to live in their home in November of 2001. Teddie said that, although she and

No. 14-70033

Rachel were both very close with Nikki, [Roberson] was not, nor did he seem to care about her.  She said that Nikki did not like to be around [Roberson] and would cry every time he tried to pick her up or play with her.

Teddie testified that [Roberson] had a bad temper, and that he would yell at Nikki when she cried, which apparently happened every time he approached her.  Teddie said she once heard [Roberson] yell at Nikki: "If you don't shut up I'm going to beat your ass."  She also said that [Roberson] would hit Nikki with his hand and also once with a paddle.  She said that on that occasion she told [Roberson] that he should not do that because Nikki was a baby.  That whipping left bruising on Nikki's buttocks which the Bowmans later noticed.  Teddie said that, when the Bowmans asked about it, [Roberson] told them that Rachel did it.  She said that she confronted [Roberson] about the incident and that he promised her he would never hit Nikki again.

Teddie also testified that she witnessed [Roberson], when he was angry at Nikki, pick her up off the bed, shake her for a few seconds, and throw her back on the bed.  This upset Teddie, and she briefly left [Roberson]'s home with Rachel, but [Roberson] apologized and convinced her to return.  According to Teddie, this incident happened within a month of Nikki's death.

Teddie testified that, on the evening of January 30, 2002, Teddie was in the hospital after undergoing a hysterectomy procedure.  Nikki was staying with the Bowmans, but Mrs. Bowman became ill, so it became necessary for [Roberson] to pick up Nikki and look after her.  Teddie said [Roberson] seemed mad about this development, because he preferred to stay with her in her hospital room watching a movie on television.  Teddie said [Roberson] had never once before been asked to be the sole caretaker of Nikki.  She said [Roberson] did not leave immediately, but waited quite a while and, when he finally did leave, he was mad.

The next morning, Teddie was told she was being released. When she spoke to [Roberson] about picking her up, he said that he was bringing Nikki to the hospital because she wasn't breathing and he couldn't get her to wake up.  Teddie noted that he did not seem upset about the situation.  She called him back five minutes later, but he still had not yet left the house, so she urged him to do so.  She then went to the nurse's desk to get a wheelchair so she could make her way downstairs to meet them as they arrived.

6

[Roberson] eventually pulled into the parking lot.  Teddie said he did not seem to be moving urgently and in fact found a parking spot instead of pulling up to the front door.  Nor did he seem to be in any hurry to get Nikki out of the car.

Teddie urged him to bring Nikki to her, and he did.  Teddie said Nikki was limp, blue, and did not appear to be breathing.  Teddie said she asked [Roberson] what happened, and he said that they had fallen asleep in bed while watching a movie and that he awoke to her crying near the foot of the bed, on the floor.  He said he made sure that she was okay and then brought her back into bed with him, and they went back to sleep.  Teddie said she was skeptical of this story, because, in her experience, Nikki would always cry for Teddie when [Roberson] tried to sleep in the bed with her.  In fact, Teddie said, [Roberson] later did tell her that Nikki was crying for her.

Nikki died from her injuries after being taken to the hospital in Dallas.  Teddie could not accompany Nikki when she was taken to Dallas, but she did not want to return to [Roberson]'s home, so she took her daughter to stay with a relative.  In the ensuing weeks, she spoke with [Roberson] occasionally, and she said he never once mentioned Nikki, and that when she did he expressed no interest in talking about her.  Teddie said he did not seem sad or emotionally distraught, but that he just showed no interest.  At one point, while [Roberson] was in the Anderson County Jail, Teddie said she asked him directly if he had killed Nikki.  She said his response was that if he did do it, he didn't remember; that he might have "snapped," but that he doesn't remember doing so.

*Id.* at *2–*3.  The state next called Dr. Jill Urban, who performed the autopsy on Nikki.  Dr. Urban testified as to her findings in the autopsy and her conclusion that Nikki died from blunt force head injuries, defined to include shaking.  Dr. Urban testified that she found no injury to Nikki's anus and that tests for semen and spermatozoa came back negative.  Last, the state called Verna Bowman, Nikki's maternal grandmother.  Ms. Bowman described the custody battle between herself and Roberson's mother, and explained that she and her husband ultimately reached an agreement when Roberson himself asked for custody.  Ms. Bowman then gave her account of an incident described by other witnesses as well, in which Nikki had been spanked, leaving bruises

on her buttocks. Ms. Bowman testified that Roberson brought Nikki over and explained the bruising by blaming Rachel. Ms. Bowman testified that Roberson's explanation sounded strange. Ms. Bowman then recounted how she and her husband were asked to babysit Nikki while Cox was in the hospital for her surgery, and explained that she became sick and had to ask Roberson to come pick Nikki up. After Ms. Bowman's testimony, the state rested.

The defense case-in-chief then began with the testimony of "Patricia Conklin, Teddie's sister, who testified that, in her opinion, [Roberson] had a loving relationship with Nikki." *Id.* at *4. "She said that in her experience she had never seen [Roberson] spank Nikki, but that she had once seen Rachel do so." *Id.* "She also said that, in her opinion, Teddie had a poor reputation for truthfulness." *Id.* Roberson also attempted to call an expert witness in his defense, Dr. John Claude Krusz. Prior to his testifying, the state took Dr. Krusz on voir dire. Dr. Krusz testified during the state's voir dire that he is a board certified neurologist who examined Roberson. Dr. Krusz diagnosed Roberson with organic brain disorder, and more specifically post-concussional syndrome. Dr. Krusz testified that Roberson has an IQ of 85, poor impulse control, and difficulty making decisions. Dr. Krusz testified that the disorder interferes with Roberson's reasoning ability, his ability to make rational decisions, and his ability to intentionally or knowingly carry out an act. During the voir dire, one of Roberson's attorneys also questioned Dr. Krusz:

> Q. Doctor, your opinions with respect to Robert's condition, do you think that they would be of benefit to the jury in understanding Robert's ability to deal with the situation of stress?
> A. I believe they would.
> Q. All right. And I reviewed with you what's called culpable mental states that are recognized under law?
> A. Yes.
> Q. And this that you have found with Robert, does it have a direct relationship based upon reasonable medical probability

and established scientific grounds to kind of give an indication of how he performed relative to those culpable mental states?

A.     Yes, I believe we have that information.

The state then re-urged its objection, arguing that Dr. Krusz's testimony amounted to a "diminished capacity" defense, not recognized under Texas law. The trial judge agreed and excluded Dr. Krusz's testimony.  Defense counsel further examined Dr. Krusz, however, as an offer of proof for their bill of exceptions.  Defense counsel asked Dr. Krusz if Roberson would satisfy the legal definition of insanity:

Q.     Okay.  By the way, you are familiar with the legal standard for a person being established as insane, are you not?

A.     Yes.

Q.     That a person cannot tell right from wrong, cannot tell the significant character of his actions?

A.     That's correct.

Q.     Would that type of level of insanity rise to Robert's situation?

A.     No, sir.

Dr. Krusz then testified further:

Q.     Okay.  Say the situation were one was to take care of a small child who was ill, fussy, and you had no prior child caring capability or experience.  Would that be a stressor that would affect Robert differently than normal individuals?

A.     I believe it would, yes, sir.

Q.     Okay.  Would that effect be such that it would create an emotional control over his behavior?

A.     I believe so, yes.

Q.     Okay.  You determined that there was some organic or actual brain injury?

A.     Yes.  My clinical diagnosis is that Mr. Roberson does have abundant evidence of traumatic brain injury or, as I mentioned earlier, post concessional syndrome.

Q.     Okay.  And this affects his reasoning capability?

A.     Precisely.  Specifically with respect to what we term inhibition of behaviors by frontal lobe [sic] of the brain.

9

Q.     Okay.  And you feel that this would be evidence that would aid a trier of fact in establishing or judging a person's actions?

A.     I believe it would.

After concluding its offer of proof, the defense rested and both sides closed the evidence.  Prior to closing arguments, the prosecution also expressly dropped the murder committed during the course of committing or attempting to commit aggravated sexual assault manner and means, sending only the murder of a child under six years old manner and means to the jury.

The defense closing argument focused almost exclusively on raising reasonable doubt as to whether Roberson had the requisite culpable mental state at the time he killed Nikki.  The defense essentially conceded that Roberson's story about Nikki falling off the bed was fabricated and instead argued that he did not intentionally or knowingly kill Nikki, the requisite mens rea for capital murder, and that one of the other homicide offenses under Texas law was a more appropriate punishment.  The defense also argued that the evidence supporting sexual assault was so weak that the state had abandoned that manner and means.

In its rebuttal, the state argued that the extent of Nikki's injuries proved that Roberson knowingly and intentionally murdered Nikki.  The state also argued that it had dropped the sexual assault manner and means only because the law required the state to elect one manner and means at the close of evidence—i.e., the law prohibited the state from sending both manner and means to the jury.

The jury returned a verdict of capital murder.  Roberson was sentenced to death.

On direct appeal, Roberson raised two of the claims that are now before us.  Rejecting Roberson's claim that the trial court's failure to sever the murder committed during the course of a sexual assault manner and means violated

the Texas Penal Code and the United States Constitution, the Court of Criminal Appeals stated, "[t]he indictment in this case did not allege two separate offenses, but rather one offense (capital murder) under two different theories (the victim was under six years of age, and the murder was committed in the course of committing aggravated sexual assault)." *Id.* at *6. As such, the court concluded that "[t]he trial court did not err by denying [Roberson]'s motion to sever under Section 3.04" of the Texas Penal Code and that the failure to sever did not "implicate, much less violate, any of [Roberson]'s federal constitutional rights." *Id.* The Court of Criminal Appeals also confronted— and rejected—Roberson's contention that the trial court's exclusion of Dr. Krusz's testimony violated his constitutional rights. The court noted that though "Texas does not recognize 'diminished capacity' as an affirmative defense, *i.e.*, a 'lesser form of the defense of insanity,'" the situation is different where "mental-health evidence is presented, not as part of an attempted affirmative defense, but instead as an attempt to negate the *mens rea* element of the charged offense," and, under Texas law, "such evidence is admissible, assuming it meets the requirements of Rule 403." *Id.* at *7 (quoting *Jackson v. State*, 160 S.W.3d 568, 573 (Tex. Crim. App. 2005)). The court concluded, however, that Dr. Krusz's "proposed testimony regarding organic brain syndrome and poor impulse control is not relevant as to [Roberson]'s ability to form the requisite *mens rea* for the offense," but rather "was merely being used as a mental-health defense not rising to the level of insanity." *Id.* at *8.

In December of 2004, Roberson filed an application for a writ of habeas corpus in state court. As to the first issue raised by Roberson herein, that the prosecutor violated his constitutional rights by proceeding to trial on the sexual assault manner and means when he knew it could not be proved beyond a reasonable doubt, the state court concluded that Roberson was "procedurally barred from asserting these complaints by way of the writ of habeas corpus

because he could have, but did not, raise the claim on direct appeal." Alternatively, the court found and concluded "as a matter of law that [Roberson] has failed to state a claim upon which relief could be granted, because he has failed to state any constitutional basis upon which the prosecutor here could have been barred from proceeding to trial upon a valid indictment returned by the grand jury." On appeal from the denial of the application for a writ of habeas corpus, the Texas Court of Criminal Appeals issued only a summary opinion, stating, in pertinent part:

> This Court has reviewed the record with respect to the allegations made by applicant. We adopt the trial judge's findings of fact. Based upon the trial court's findings and conclusions and our own review, the relief sought is denied.

*Ex parte Roberson*, Nos. WR-63,081-01 & WR-63,081-02, 2009 WL 2959738, at *1 (Tex. Crim. App. Sept. 16, 2009) (unpublished) (per curiam).

Roberson then filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Texas. He alleged thirty-nine claims in his petition. The report and recommendation issued by the magistrate judge recommended denial of Roberson's petition. Rejecting Roberson's objections, the district court adopted the magistrate judge's report and recommendation and also denied a certificate of appealability.

Roberson has now applied to this court for a certificate of appealability on three of the thirty-nine issues raised in his petition. First, Roberson argues that the State violated his constitutional rights by presenting evidence as to the manner and means of murder committed during the course of a sexual assault in order to inflame the jury, with knowledge that the evidence was insufficient to support conviction. Second, Roberson argues that the Constitution required the state court to sever the sexual assault manner and means for a separate trial. Third, Roberson argues that the trial court's

No. 14-70033

exclusion of Dr. Krusz's testimony violated his Constitutional right to present a complete defense.

## II.

Petitions for a writ of habeas corpus made by prisoners in state custody to federal courts are governed by the Anti-terrorism and Effective Death Penalty Act ("AEDPA"). 28 U.S.C. § 2254. Under AEDPA, a state prisoner is not entitled to a writ of habeas corpus from a federal court unless he demonstrates that the state court's adjudication of his claim on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "A state court's decision is contrary to clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Ward v. Stephens*, 777 F.3d 250, 255 (5th Cir. 2015) (internal quotation marks and brackets omitted). "By contrast, a state court's decision involves an unreasonable application of clearly established federal law if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* (internal quotation marks and brackets omitted). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "This is a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, -

-- U.S. ---, ---, 131 S. Ct. 1388, 1398 (2011) (citation and internal quotation marks omitted).

Additionally, a claim procedurally defaulted on independent and adequate state law grounds by the petitioner in state court is generally not cognizable in federal district court. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In order to preclude federal review of the petitioner's claim, the state procedural rule must be "adequate to support the judgment" and "firmly established and consistently followed." *Martinez v. Ryan*, --- U.S. ---, ---, 132 S. Ct. 1309, 1316 (2012). The petitioner may avoid his procedural default by showing "'cause for the default and prejudice from a violation of federal law.'" *Trevino v. Thaler*, --- U.S. ---, ---, 133 S. Ct. 1911, 1917 (2013) (quoting *Martinez*, 132 S. Ct. at 1316). The petitioner may also overcome the procedural default by showing that "the failure to consider his claims would result in a fundamental miscarriage of justice because he is 'actually innocent' of the offense underlying his conviction or 'actually innocent' of the death penalty." *Roberts v. Thaler*, 681 F.3d 597, 605 (5th Cir. 2012).

Further, AEDPA restricts a petitioner's right to appeal a federal district court's denial of his petition for a writ of habeas corpus. *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003). In order to appeal, the petitioner must first obtain a certificate of appealability from a circuit judge or justice. 28 U.S.C. § 2253(c)(1). A certificate of appealability "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "'A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *United States v. Fields*, 761 F.3d 443, 451 (5th Cir. 2014) (quoting *Miller-El*, 537 U.S. at 327). "To obtain a COA when the district court has denied relief on procedural

grounds, such as procedural default, a petitioner must show both a debatable claim on the merits *and* that the district court's procedural ruling is debatable." *Garza v. Stephens*, 738 F.3d 669, 673 (5th Cir. 2013). "The question of whether a COA should issue is a threshold inquiry that requires an overview of the claims in the habeas petition and a general assessment of their merits;" "[a] full consideration of the merits is neither required nor permitted." *Ruiz v. Stephens*, 728 F.3d 416, 423 (5th Cir. 2013) (footnote and internal quotation marks omitted). But the "determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." *Ward*, 777 F.3d at 255 (internal quotation marks omitted). Nevertheless, in a death penalty case, any doubts as to whether a certificate of appealability should issue are resolved in favor of the petitioner. *United States v. Bernard*, 762 F.3d 467, 471 (5th Cir. 2014).

## III.

Roberson's first claim is that his due process and fair trial rights were violated by the prosecutor's actions in trying him on the murder committed "in the course of committing or attempting to commit . . . aggravated sexual assault" theory of capital murder in addition to the murder of a child under the age of six theory. Tex. Penal Code § 19.03(a)(2). Roberson argues that the prosecutor knew that he could not prove the aggravated sexual assault theory, but argued the theory merely to prejudice Roberson and inflame the jury. We do not address the merits of this argument, or its underlying theory, as this claim is procedurally defaulted on an independent and adequate state law ground.

The state district court held that Roberson defaulted this claim by failing to raise it on direct appeal. The state court here expressly relied on Roberson's failure to raise his claim on direct appeal and concluded that the claim was

defaulted.  We presume that failure to raise a claim on direct appeal is an independent and adequate state law grounds for procedural default, and Roberson makes no argument to rebut that presumption.  *See Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir. 1995) ("We presume the adequacy and independence of a state procedural rule when the state court expressly relies on it in deciding not to review a claim for collateral relief, as the Mississippi Supreme Court did here."); *Moore v. Roberts*, 83 F.3d 699, 702 (5th Cir. 1996).  Roberson's only argument as to the direct appeal procedural default is that there was cause and prejudice by virtue of his direct appellate counsel's ineffective assistance. Assuming without deciding that Roberson's direct appellate counsel's ineffective assistance could provide cause to excuse the procedural default of this claim, Roberson has wholly failed to make such a showing.  In order to show ineffective assistance of counsel on direct appeal, Roberson must show that his appellate counsel's performance was deficient and that the deficient performance caused him prejudice.  *Dorsey v. Stephens*, 720 F.3d 309, 319 (5th Cir. 2013); *see also id.* (stating that claims of ineffective assistance of counsel on direct appeal are governed by the two-part standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984)).  "[C]ounsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'"  *Pinholster*, --- U.S. at ---, 131 S. Ct. at 1403 (quoting *Strickland*, 466 U.S. at 690).  In order to be considered ineffective, the attorney must have "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Strickland*, 466 U.S. at 687.  Roberson has wholly failed to demonstrate deficient performance by his attorney on direct appeal.  To show ineffective assistance, Roberson points only to the bare fact that his attorney did not raise on direct appeal the argument he now puts forward.  But the mere fact that his attorney did not raise an argument is insufficient to show that his

attorney's decision not to do so was deficient. *See Smith v. Robbins*, 528 U.S. 259, 288 (2000) ("[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."); *Dorsey*, 720 F.3d at 320 ("When, as here, counsel files a merits brief, a defendant generally must show that 'a particular nonfrivolous issue was clearly stronger than issues counsel did present.'" (quoting *Robbins*, 528 U.S. at 288)); *id.* ("There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect." (internal quotation marks omitted)).   Given Roberson's total lack of argument that his direct appellate counsel's performance fell outside the realm of "the exercise of reasonable professional judgment," *Pinholster*, --- U.S. at ---, 131 S. Ct. at 1403 (internal quotation marks omitted), he has failed to show cause and prejudice with regard to his procedural default of his first claim.   As such, reasonable jurists could not debate that the district court's disposition of this claim was proper.

IV.

Roberson's second claim is that his procedural due process rights and his right to a fair trial were violated by trying him on the two theories of capital murder—murder committed during an aggravated sexual assault and murder of a child—in one trial.   Roberson contends that, given the incendiary nature of the murder committed during an aggravated sexual assault theory, the Constitution requires two separate trial to avoid jury prejudice.   We deny a certificate of appealability on this point, as reasonable jurists would not debate the district court's rejection of Roberson's contention.

As support for his argument, Roberson cites *State v. Boscarino*, 529 A.2d 1260 (Conn. 1987), a Connecticut Supreme Court case.   But *Boscarino* provides Roberson with no support whatsoever for overcoming the burden of AEDPA.

No. 14-70033

No matter the persuasiveness of the Connecticut Supreme Court's opinion in *Boscarino*, state court decisions do not constitute "clearly established Federal law, *as determined by the Supreme Court of the United States.*" 28 U.S.C. § 2254(d)(1) (emphasis added); *cf. Parker v. Matthews*, --- U.S. ---, ---, 132 S. Ct. 2148, 2155 (2012) ("[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' 28 U.S.C. § 2254(d)(1). It therefore cannot form the basis for habeas relief under AEDPA."). *Boscarino* is also wholly distinguishable. First, the court in *Boscarino* was applying Connecticut law, not the United States Constitution. *Boscarino*, 529 A.2d at 1264. Second, in *Boscarino*, the defendant was jointly tried for separate criminal incidents, four sexual assaults of four separate victims on four different dates. *Id.* at 1262. Here, by contrast, there was only one criminal incident—one capital murder of one victim—but two separate and alternative statutory aggravating elements alleged. *Boscarino* is, therefore, not instructive.

Roberson also cites four Supreme Court cases in support of his argument—*Crane v. Kentucky*, 476 U.S. 683 (1986); *Washington v. Texas*, 388 U.S. 14 (1967); *California v. Trombetta*, 467 U.S. 479 (1984); and *Chambers v. Mississippi*, 410 U.S. 284 (1973). All four of those cases, however, address state courts' limitations on a defendant's ability to introduce evidence to defend against the criminal charges brought against him. *See Crane*, 476 U.S. at 690–91 (holding that the state court's exclusion of evidence probative of the credibility of the defendant's confession because the proffered evidence was also relevant to voluntariness, an issue the court had already ruled on, violated the defendant's right to a fair trial under the Sixth and Fourteenth Amendments); *Washington*, 388 U.S. at 15, 23 (holding that a state statute barring the defendant from calling a "principal[], accomplice[], or accessor[y] in the same crime" as a witness in his defense violated the defendant's rights

18

to call witnesses in his own defense and to compulsory process for obtaining such witnesses); *Trombetta*, 467 U.S. at 491 (holding that the Constitution does not require the state to preserve a breath sample used in a breath-analysis test in a DUI prosecution); *Chambers*, 410 U.S. at 295–98, 302–03 (holding that the Mississippi voucher and hearsay rules were unconstitutional as applied to the extent that they prevented the defendant from: (1) putting on evidence of a third party's confession to the crime with which the defendant was charged and (2) challenging that witness's subsequent retraction).  None of these cases holds that a state court is constitutionally required to sever different manner and means of committing a single offense for separate trials.  One Supreme Court case not cited by Roberson, *United States v. Lane*, 474 U.S. 438 (1986), comments in a footnote that "[i]mproper joinder does not, in itself, violate the Constitution," but states that "misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *Id.* at 446 n.8.  The Supreme Court has not since expanded on its statement in *Lane*.  Aside from our grave doubts that two sentences of dicta in a footnote could constitute "clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), *Lane* involved joinder of a separate incident of mail fraud alleged against only one of the defendants, 474 U.S. at 442.  It is therefore wholly distinguishable from the present case where there were not two charges, but two manner and means of committing the same offense—the murder of a single individual by a single defendant. As such, reasonable jurists would not debate the district court's determination that Roberson has failed to show that the Texas court's decision was contrary to or an unreasonable application of clearly established Federal law, as interpreted by the Supreme Court.

No. 14-70033

V.

Roberson's third contention is that the state trial court's exclusion of his expert witness's testimony violated his due process rights and his right to present witnesses in his own defense. Roberson argues that the testimony of that expert, Dr. Krusz, was relevant as it tended to show that he did not act intentionally or knowingly in killing his daughter, an element the state had the burden to prove beyond a reasonable doubt. *See* Tex. Penal Code § 19.03(a); Tex. Penal Code § 19.02(b)(1). The state argues that Roberson's argument is foreclosed by *Clark v. Arizona*, 548 U.S. 735 (2006), in which the Supreme Court upheld an Arizona law channeling all expert mental health testimony into the insanity defense and precluding its admission to negate mens rea. *See id.* at 779 ("Arizona's rule serves to preserve the State's chosen standard for recognizing insanity as a defense and to avoid confusion and misunderstanding on the part of jurors. For these reasons, there is no violation of due process . . . and no cause to claim that channeling evidence on mental disease and capacity offends any principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." (internal quotation marks and footnote omitted)). The citation to *Clark*, however, misses the mark, because Texas has not adopted a rule akin to Arizona's, as the Texas Court of Criminal Appeals acknowledged in this case. *See Roberson*, 2002 WL 34217382, at \*8. Instead, Texas allows evidence that is "presented, not as part of an attempted affirmative defense, but instead as an attempt to negate the mens rea element of the charged offense," "assuming it meets the requirements of Rule 403." *Id.* at \*7. The Texas Court of Criminal Appeals, on direct appeal, held that the testimony of Dr. Krusz was properly excluded not because of a categorical rule like that in *Clark*, and not because the evidence ran afoul of Rule 403, but because it was "not relevant as to the appellant's ability to form the requisite *mens rea* for the offense." *Id.* at \*8. The court held instead that the expert

testimony "was merely being used as a mental-health defense not rising to the level of insanity." *Id.*

The Supreme Court has made clear that "[t]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense" and that "evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve" infringe that right. *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (internal quotation marks and brackets omitted). Roberson, of course, ultimately bears the burden of persuading us that Dr. Krusz's testimony was substantial enough that its exclusion constituted an "unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Yet the issue is debatable by jurists of reason. Accordingly, we GRANT a certificate of appealability as to Issue Three.

## VI.

For the reasons stated above, Roberson's application for a certificate of appealability is DENIED as to Issues One and Two and GRANTED as to Issue Three. The Clerk is ORDERED to establish a briefing schedule directed to Issue Three.

21