# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-70033

ROBERT LESLIE ROBERSON, III,

Petitioner - Appellant

v.

WILLIAM STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

United States Court of Appeals
Fifth Circuit

**FILED**

August 10, 2015

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 2:09-CV-327

Before KING, JOLLY, and HAYNES, Circuit Judges.

PER CURIAM:*

Petitioner-Appellant Robert Leslie Roberson, III, appeals the district court's denial of his petition for a writ of habeas corpus. Roberson argues that the Texas courts' exclusion of his expert witness's testimony violated his right to due process of law and to present witnesses in his own defense. Because we conclude that the exclusion of his witness's testimony was not an unreasonable

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-70033

application of clearly established Federal law as determined by the Supreme Court of the United States, we AFFIRM the judgment of the district court.

## I.

The underlying facts are set out in our earlier opinion regarding the certificate of appealability in this case. *See Roberson v. Stephens*, --- F. App'x ---, No. 14-70033, 2015 WL 3396822, at *1–*8 (5th Cir. May 27, 2015) (unpublished) (per curiam).

In brief, Roberson was convicted of capital murder and sentenced to death for killing his two-year-old daughter, Nikki Curtis. During his trial, Roberson attempted to call an expert witness, Dr. John Claude Krusz, to testify that Roberson suffered from an organic brain disorder, specifically post-concussional syndrome. During voir dire by the state and an offer of proof, Dr. Krusz testified that Roberson's condition affected his impulse control and reasoning ability.[1] The trial court excluded the proffered testimony, and the Texas Court of Criminal Appeals affirmed on direct appeal.

The Court of Criminal Appeals stated that while "Texas does not recognize 'diminished capacity' as an affirmative defense, *i.e.*, a 'lesser form of the defense of insanity,'" the situation is different where "mental-health evidence is presented, not as part of an attempted affirmative defense, but instead as an attempt to negate the *mens rea* element of the charged offense." *Roberson v. State*, No. AP-74671, 2002 WL 34217382, at *7 (Tex. Crim. App. June 20, 2007) (unpublished) (quoting *Jackson v. State*, 160 S.W.3d 568, 573 (Tex. Crim. App. 2005)). Under Texas law, evidence of the latter sort "is admissible, assuming it meets the requirements of Rule 403." *Id.* After summarizing the Supreme Court's decision in *Clark v. Arizona*, 548 U.S. 735 (2006), the court stated "[a]cknowledging this ruling, we adhere to our decision

---

[1] Dr. Krusz also testified in mitigation at sentencing.

No. 14-70033

in *Jackson* and will continue to give the trial judge discretion to determine whether mental-health evidence proposed by the defendant is relevant to *mens rea* and admissible." *Id.* at *8. The court concluded, however, that Dr. Krusz's "proposed testimony regarding organic brain syndrome and poor impulse control is not relevant as to [Roberson]'s ability to form the requisite *mens rea* for the offense," but rather "was merely being used as a mental-health defense not rising to the level of insanity." *Id.* at *8.

In his petition for a writ of habeas corpus to the United States District Court for the Eastern District of Texas, Roberson argued, *inter alia*, that the trial court's exclusion of Dr. Krusz's testimony violated his Constitutional right to present a complete defense. The district court denied his petition, and we granted a certificate of appealability as to that issue only. *See Roberson v. Stephens*, 2015 WL 3396822, at *12–*13.

## II.

A state prisoner must satisfy the standard set out in the Anti-terrorism and Effective Death Penalty Act ("AEDPA") in order to obtain a writ of habeas corpus from a federal court. 28 U.S.C. § 2254. AEDPA requires the petitioner to show that the state court decision pursuant to which he is held in custody "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts." *Matamoros v. Stephens*, 783 F.3d 212, 215 (5th Cir. 2015) (quoting *Gray v. Epps*, 616 F.3d 436, 439 (5th Cir. 2010)). "A state court's decision involves an 'unreasonable application' of clearly

3

No. 14-70033

established federal law if 'the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Garcia v. Stephens*, --- F.3d ---, ---, No. 14-70035, 2015 WL 4393871, at *4 (5th Cir. July 17, 2015) (alteration in original) (quoting *Hoffman v. Cain*, 752 F.3d 430, 437 (5th Cir. 2014)).

## III.

Roberson argues that the state trial court's exclusion of his expert witness's testimony violated his due process rights and his right to present a complete defense. Roberson argues that the state had the burden of proving, beyond a reasonable doubt, that he acted intentionally or knowingly when he killed his daughter in order to prove capital murder. *See* Tex. Penal Code § 19.03(a); Tex. Penal Code § 19.02(b)(1). Roberson contends that Dr. Kruz's testimony tended to negate that element and was therefore unconstitutionally excluded by the trial court.

"[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (internal quotation marks omitted). "This right is abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are "'arbitrary" or disproportionate to the purposes they are designed to serve.'" *Id.* (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)). Per that constitutional guarantee, the Supreme Court in *Crane v. Kentucky* held that the state court erred in excluding "competent, reliable evidence bearing on the credibility of [the defendant's] confession" merely because the trial court had ruled the confession voluntary. 476 U.S. 683, 690 (1986); *see id.* at 690–91 ("Th[e] opportunity [to be heard] would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence. In the absence of any valid state justification,

exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing." (internal quotation marks omitted)); *see also Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) ("The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice."); *Washington v. Texas*, 388 U.S. 14, 23 (1967) ("We hold that the petitioner in this case was denied his right to have compulsory process for obtaining witnesses in his favor because the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense.").

Yet the general principle announced in *Holmes* and its forebears is complicated when applied in the context of expert witnesses testifying to a defendant's mental health issues. In *Clark*, the Supreme Court confronted a state rule of evidence that excluded all expert testimony regarding the defendant's mental health unless it was offered to prove an insanity defense; i.e., such evidence could not be offered to refute mens rea. 548 U.S. at 756–57. In rejecting the defendant's challenge to that rule, the Supreme Court noted that "the right to introduce relevant evidence can be curtailed if there is a good reason for doing that." *Id.* at 770; *see also id.* ("'While the Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude

evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.'" (alteration in original) (quoting *Holmes*, 547 U.S. at 326)).  The court found four reasons for Arizona's rule that rendered it constitutionally permissible. The first reason was that allowing expert mental health evidence as to mens rea would undermine the state's "authority to define its presumption of sanity (or capacity or responsibility) by choosing an insanity definition, . . . and by placing the burden of persuasion on defendants who claim incapacity as an excuse from customary criminal responsibility."  *Id.* at 771.[2]   The court then found three other "characteristics of mental-disease and capacity evidence that may reasonably be hedged by channeling the consideration of such evidence to the insanity issue" on which the defendant generally bears the burden of proof. *Id.* at 774.  The first is that the diagnosis of mental disease "may mask vigorous debate within the profession about the very contours of the mental disease itself," leading to "a general caution in treating psychological classifications as predicates for excusing otherwise criminal conduct."  *Id.* at 774–75.  The second is "the potential of mental-disease evidence to mislead jurors (when they are the factfinders) through the power of this kind of evidence to suggest that a defendant suffering from a recognized mental disease lacks cognitive, moral, volitional, or other capacity, when that may not be a sound conclusion at all."

---

[2] The Court also held that this rationale was insufficient on its own:

An insanity rule gives a defendant already found guilty the opportunity to excuse his conduct by showing he was insane when he acted, that is, that he did not have the mental capacity for conventional guilt and criminal responsibility. But, as the dissent argues, if the same evidence that affirmatively shows he was not guilty by reason of insanity (or "guilty except insane" under Arizona law, Ariz.Rev.Stat. Ann. § 13–502(A) (West 2001)) also shows it was at least doubtful that he could form *mens rea*, then he should not be found guilty in the first place; it thus violates due process when the State impedes him from using mental-disease and capacity evidence directly to rebut the prosecution's evidence that he did form *mens rea*.

*Id.* at 773–74.

*Id.* at 775. The last concerns the "particular risks inherent in the opinions of the experts who supplement the mental-disease classifications with opinions on incapacity," namely, the required judgment-calls in making the inference from the diagnosis to an opinion on the defendant's mental state at the time of the offense and from "the concepts of psychology, which are devised for thinking about treatment, to the concepts of legal sanity, which are devised for thinking about criminal responsibility." *Id.* at 776–77. As the rule in question "serve[d] to preserve the State's chosen standard for recognizing insanity as a defense and to avoid confusion and misunderstanding on the part of jurors," there was "no violation of due process under *Chambers* and its progeny, and no cause to claim that channeling evidence on mental disease and capacity offends any principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* at 779 (internal quotation marks omitted).

*Clark* does not, however, resolve Roberson's challenge in this case, as the State contends, because Texas has not adopted a rule channeling all expert testimony on mental disease and capacity into an insanity defense and excluding it from consideration as to mens rea. *See Roberson*, 2002 WL 34217382, at *8. Though "Texas does not recognize 'diminished capacity' as an affirmative defense, i.e., a 'lesser form of the defense of insanity,'" where "mental-health evidence is presented, not as part of an attempted affirmative defense, but instead as an attempt to negate the *mens rea* element of the charged offense," under Texas law, "such evidence is admissible, assuming it meets the requirements of Rule 403." *Id.* at *7 (quoting *Jackson*, 160 S.W.3d at 573). Thus, while *Clark* recognized that there are justifications that allow a state to constitutionally channel expert mental health evidence away from disputing mens rea and into the insanity defense, Texas does not rely on any such justifications and follows no such rule. Roberson's challenge thus

presents a question as to whether the fact that a state has not followed a path that is open to it is of constitutional significance.

Yet while that question may demand resolution in a different context, our review in this case is governed by the deferential standard of AEDPA. Given the ambiguity created by the gap between *Holmes* and *Clark*, as well as the minimal probative value of Dr. Krusz's testimony on the issue of mens rea, we conclude that the Texas courts' denial of Roberson's claim was not an unreasonable application of clearly established Federal law, as determined by the United States Supreme Court. Dr. Krusz diagnosed Roberson with an organic brain disorder, more specifically, post-concussional syndrome. On voir dire during the guilt phase of the trial, Dr. Krusz testified that the syndrome would affect Roberson's ability to carry out an act intentionally or knowingly. He also testified that he could relate the diagnosis to the relevant culpable mental states under the law. But Dr. Krusz's testimony during the offer of proof for the bill of exceptions did not deliver on that promise. Dr. Krusz testified that, as a result of Roberson's condition, a small child who was ill and fussy would be a stressor that would affect Roberson differently than normal individuals given Roberson's lack of child caring capability or prior child caring experience. Dr. Krusz also testified that the effect of such a stressor would be, to use the diction of defense counsel's question, an emotional control over Roberson's behavior. He also testified that Roberson's post-concussional syndrome would affect Roberson's reasoning capability, "[s]pecifically with respect to what we term inhibition of behaviors by frontal lobe [sic] of the brain." Roberson elicited no testimony connecting those conclusions to Roberson's ability to form knowledge or intent. Based on Dr. Krusz's testimony during voir dire and Roberson's offer of proof, we cannot conclude that the Court of Criminal Appeals' conclusion that Dr. Krusz's "proposed testimony regarding organic brain syndrome and poor impulse control is not relevant as

to [Roberson]'s ability to form the requisite *mens rea* for the offense," but rather "was merely being used as a mental-health defense not rising to the level of insanity" was contrary to or an unreasonable application of clearly established Federal law, as determined by the Supreme Court.  The district court therefore did not err in denying Roberson's petition for a writ of habeas corpus.

As a matter of completeness, we also consider Dr. Krusz's testimony during the sentencing phase.  During that phase, Dr. Krusz again turned to his conclusions regarding Roberson's ability to form knowledge or intent:

> Q.     Would that go to affecting his intent or his knowledge, awareness of what he's doing?
> A.     Not necessarily.  People who sometimes have alterations in their behavior often don't have a direct awareness of it.  Just as an example, different context, but actually the underpinning of brain injury is the commonality.  I've had people drive three states and not have any memory of the act of driving there.  They obviously got there safe and began to wonder how they arrived, but sometimes the brain can get into a state where it's not quite connected to its environment.
> Q.     Do you believe that that's possible in this situation?
> A.     Theoretically, yes.
> Q.     All right.  And without actually having been there and seen all sorts of diagnostic things going on at the time of the incident, is there any way really to tell?
> A.     No.
> Q.     Okay.  But the base material is kind of there; it's brain damage?
> A.     Yes.
> Q.     The emotional issues?
> A.     Correct.
> Q.     The limitation of IQ?
> A.     Yes.  The acumen is limited.
> Q.     And some of the traumatic events that you talked about?
> A.     Yes.  They were present, at least in the history.

Given the ambiguous and equivocal nature of Dr. Krusz's opinion, which was merely that Roberson's post-concussional syndrome "theoretically" could have

affected his formation of intent or knowledge, but that it did "[n]ot necessarily" do so, and that there was not any way really to tell, Dr. Krusz's testimony at sentencing does not alter our conclusion that, under the deferential standard of review articulated in AEDPA, the decision of the Court of Criminal Appeals was not "contrary to, or . . . an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

## IV.

For the foregoing reasons, we AFFIRM the judgment of the district court.