J-S35019-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| JAHINA DAMON | |
| Appellant | No. 2526 EDA 2014 |

Appeal from the Judgment of Sentence July 24, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0012402-2008

BEFORE:  MUNDY, OLSON and PLATT,* JJ.

MEMORANDUM BY OLSON, J.:                    **FILED JUNE 24, 2015**

Appellant, Jahina Damon, appeals from the judgment of sentence entered on July 24, 2014, after the trial court found her guilty but mentally ill of first-degree murder, arson, possessing an instrument of crime and two counts each of attempted murder and aggravated assault.[1]

We briefly summarize the facts and procedural history of this case as follows.  On December 20, 2007, at approximately 5:30 a.m., while on routine patrol, police encountered Donald Harmon and Kelly Winters on the 6000 block of Cobbs Creek Parkway in Philadelphia, Pennsylvania.  Winters was badly burned.  Police realized that the residence located at 6018 Cobbs Creek Parkway was engulfed in flames.  Winters told police that a woman

___

[1]  18 Pa.C.S.A. §§ 2502(a), 3301, 907, 901, and 2702, respectively.

___

*Retired Senior Judge assigned to the Superior Court.

came to the house to kill everybody inside and burn the house down. Harmon was living at the residence at the time with his girlfriend, Lolita Lee. Appellant is Lee's daughter. Harmon told police that he, Winters, and Lee were present at the residence when Appellant rang the doorbell at 5:00 a.m. Appellant claimed that she needed some documents and asked everyone to gather in the dining room. Appellant apologized to her mother for past behavior, read a poem, and then pulled out a gun and shot Lee. Appellant then turned and fired at Harmon and Winters. Winters fell from her chair and Harmon played dead. While mumbling what Harmon later described as "demon words" and "witchcraft," Appellant threw something on the floor and the room filled with smoke and fire. Harmon and Winters were able to escape.

After the fire was extinguished, police found a semi-automatic handgun, four bullet casings, and Lee's charred remains in the kitchen. Winters suffered from third-degree burns over 40% of her body. She was in a medically induced coma for over a month following the episode and had to undergo multiple operations over the course of years. Winters died in March 2011, as a result of corrective surgery for injuries sustained during the fire.

Police took Appellant into custody in Hagerstown, Maryland on the same day as the incident. Maryland authorities subsequently procured a search warrant for the residence where Appellant was staying. Therein, police recovered Appellant's purse that contained receipts for a handgun,

ammunition, and a mandatory Maryland firearm safety class for new gun purchasers.

A three-day bench trial commenced on February 11, 2014. Appellant presented an insanity defense. At the conclusion of trial, the trial court found Appellant guilty but mentally ill of the aforementioned offenses. The trial court ordered further mental health evaluations for placement recommendations. On July 24, 2014, the trial court sentenced Appellant to life imprisonment without parole for first-degree murder. Consecutive to Appellant's life sentence, the trial court also ordered Appellant to serve terms of 10 – 20 years of imprisonment for both arson and attempted murder of Harmon and 20 – 40 years of imprisonment for attempted murder of Winters. The trial court also sentenced Appellant to a concurrent term of two and one-half to five years' imprisonment for possessing an instrument of crime. No further sentence was imposed for Appellant's aggravated assault convictions. The trial court instructed the Bureau of Corrections to designate a treatment facility that would provide psychiatric or psychological treatment appropriate to Appellant's needs. This timely appeal resulted.[2]

Appellant raises the following issues for our review:

---

[2] Appellant filed a notice of appeal on July 24, 2014. On September 30, 2014, the trial court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant complied timely on October 18, 2014. The trial court filed an opinion pursuant to Pa.R.A.P. 1925(a) on January 15, 2015.

I.     Is [Appellant] entitled to an arrest of judgment on the charge of murder in the first degree and all related charges where the evidence is insufficient to sustain that verdict and where the evidence clearly reflected that [Appellant] was insane and should have been awarded a verdict of not guilty by reason of insanity?

II.    Is [Appellant] entitled to a new trial on the charge of murder in the first degree and all related charges where the verdict of guilty was against the greater weight of the evidence and where the greater weight of the evidence favored a verdict of not guilty by reason of insanity?

Appellant's Brief at 3 (some capitalization and suggested answers omitted).

In her first issue presented, Appellant argues that the trial court erred by failing to award her an arrest of judgment. *Id.* at 7. She admits that she committed the crimes,[3] but argues "there was insufficient evidence to find [her] guilty but mentally ill as [Appellant], on this record was clearly not guilty by reason of insanity." *Id.* Appellant argues she met her burden of proving an insanity defense because, at the time of the incident, she was under such mental defect that she could not understand the nature of her acts or that her actions were wrong. *Id.* at 8. Appellant also points to the trial testimony of her psychological expert, Dr. Kirk Heilbrun, claiming that Dr. Heilbrun "forthrightly stated and plainly said that [Appellant] could not

---

[3] Appellant concedes that the Commonwealth presented sufficient evidence of the statutory elements of each of the crimes as charged. Instead, she argues that the trial court erred by finding that she failed to prove her insanity defense. Thus, we need not address whether there was sufficient evidence to prove the individual elements of each offense.

comprehend what she was doing was wrong because she felt that what she was doing was right given that her victims were demons." ***Id.*** at 11.

Our standard of review of this claim is as follows:

> When ruling on a motion in arrest of judgment, a trial court is limited to ascertaining the absence or presence of that quantum of evidence necessary to establish the elements of the crime. At this stage in the proceedings, the trial court is limited to rectifying trial errors, and cannot make a redetermination of credibility and weight of the evidence.
>
> For purposes of appellate review,
>
>> In passing upon such a motion in arrest of judgment, the sufficiency of the evidence must be evaluated upon the *entire trial record.* All of the evidence must be read in the light most favorable to the Commonwealth and it is entitled to all reasonable inferences arising therefrom. The effect of such a motion is to admit all the facts which the Commonwealth's evidence tends to prove.
>
> In order for a trial court to properly grant a criminal defendant's motion in arrest of judgment on the ground of insufficient evidence, it must be determined that accepting all of the evidence and all reasonable inferences therefrom, upon which, if believed the verdict could properly have been based, it would be nonetheless insufficient in law to find beyond a reasonable doubt that the defendant is guilty of the crime charged.

***Commonwealth v. Marquez***, 980 A.2d 145, 147-148 (Pa. Super. 2009) (citations, quotations, and ellipsis omitted; emphasis in original).

In presenting an insanity defense, the Legislature has determined:

> **(a) General rule.--**The mental soundness of an actor engaged in conduct charged to constitute an offense shall only be a defense to the charged offense when the actor

proves by a preponderance of evidence that the actor was legally insane at the time of the commission of the offense.

> **(b) Definition.--**For purposes of this section, the phrase **"legally insane"** means that, at the time of the commission of the offense, the actor was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if the actor did know the quality of the act, that he did not know that what he was doing was wrong.

18 Pa.C.S.A. § 315.

Whereas, the Legislature has described guilty but mentally ill, in pertinent part, as such:

> **(a) General rule.--**A person who timely offers a defense of insanity in accordance with the Rules of Criminal Procedure may be found "guilty but mentally ill" at trial if the trier of facts finds, beyond a reasonable doubt, that the person is guilty of an offense, was mentally ill at the time of the commission of the offense and was not legally insane at the time of the commission of the offense.

> \* \* \*

> **(c) Definitions.--**For the purposes of this section []:

> (1) *"Mentally ill."* One who as a result of mental disease or defect, lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.

> (2) *"Legal insanity."* At the time of the commission of the act, the defendant was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if he did know it, that he did not know he was doing what was wrong.

18 Pa.C.S.A. § 314.

In discussing the interplay between the two defenses, our Court has stated:

> [T]he legislature has determined that persons classified as guilty but mentally ill either lack the capacity to appreciate the wrongfulness of their conduct or are unable to conform their conduct to the requirements of the law. However, the General Assembly determined that this classification of individuals is capable of possessing the requisite *mens rea* for the attachment of criminal responsibility. In other words, those individuals who have been found guilty but mentally ill are both "sick" *and* "bad" (i.e., criminally responsible). On the other hand, defendants who have been adjudged insane are defined as laboring under a defect of reason so grave as not to have known the nature and quality of the acts they were doing, or if they did know the nature and quality of the acts, they were unable to comprehend that what they were doing was wrong. In this classification, the legislature found that such individuals were incapable of forming the intent necessary to impose criminal liability.
>
> […B]efore determining the issue of insanity, the Commonwealth must prove each element of the offense charged. Thus, […] the Commonwealth must establish criminal intent before the issue of insanity is reached; however, the defense of legal insanity can, on those occasions when one is asserting cognitive incapacity, render a person incapable of forming criminal intent. Concomitantly, [the insanity rule established by **Regina v. M'Naghten**, 8 Eng. Rep. 718 (1843) [(the **M'Naghten** Rule)] can override the element of *mens rea* where the defendant proves the moral incapacity aspect of his defense by a preponderance of the evidence.
>
> Phrased another way, legal insanity does not necessarily eliminate *mens rea,* although it may; nor, of course, does the Commonwealth's proof of the *mens rea* element of the offense eliminate the possibility of the [factfinder] concluding that an individual is legally insane and therefore not criminally responsible. This, however, does not end our analysis of the law relative to the legal insanity defense, since an assertion of that defense automatically gives rise to

the alternative verdict of guilty but mentally ill. Indeed, unless a person pleads guilty but mentally ill, the guilty but mentally ill verdict only arises in the context of a legal insanity defense.

Accordingly, even if the Commonwealth proves each of the elements of the crimes charged beyond a reasonable doubt and the defendant fails to show by a preponderance of the evidence that he is legally insane, the [factfinder] must still consider whether the defendant was mentally ill at the time of the commission of the act. Pursuant to 18 Pa.C.S.A. § 314(a):

> A person who timely offers a defense of insanity in accordance with the Rules of Criminal Procedure may be found "guilty but mentally ill" at trial if the trier of facts finds, beyond a reasonable doubt, that the person is guilty of an offense, was mentally ill at the time of the commission of the offense and was not legally insane at the time of the commission of the offense.

The term mentally ill is defined under Pennsylvania law as "[o]ne who as a result of mental disease or defect, lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law." 18 Pa.C.S.A. § 314(c)(1). Our courts have differentiated mental illness from legal insanity by distinguishing between the appreciation of wrongfulness factor under the mentally ill definition and the lack of knowledge of wrongfulness aspects of the legal insanity definition.

*Commonwealth v. Andre*, 17 A.3d 951, 960-962 (Pa. Super. 2011) (case citations, some quotations, and some parentheticals omitted).

The *Andre* Court also noted:

> [These legal concepts] may be conceptually difficult to understand since one aspect of Pennsylvania's insanity test is that the defendant did not know what he or she was doing. If a person does not know what he or she is doing, it is hard to conceive how that individual possessed the

required *mens rea* to commit a crime. In fact, the statutory definitions of criminal intent regarding acting intentionally, knowingly, recklessly, and negligently foreclose a person from acting in any of those manners when he or she is not conscious at all of what he or she is doing. As the majority of the United States Supreme Court reasoned in ***Clark v. Arizona***, 548 U.S. 735 (2006), in distinguishing between the cognitive incapacity and moral incapacity prongs of the ***M'Naghten*** test, "In practical terms, if a defendant did not know what he was doing when he acted, he could not have known that he was performing the wrongful act charged as a crime." ***Clark, supra*** at 753–754; ***see also id.,*** at 768 n. 38 ("Not only does evidence accepted as showing insanity trump *mens rea,* but evidence of behavior close to the time of the act charged may indicate both the actual state of mind at that time and also an enduring incapacity to form the criminal state of mind necessary to the offense charged.").

Nevertheless, it is possible that an individual has the necessary *mens rea* when he or she knows what he or she is doing, but does not know that it is wrong. As an example, a defendant may intend to strike a person and knock that person unconscious, but incorrectly believe, due to a mental deficiency, that he is engaged in a boxing match. In such a situation, the defendant intends to commit the act; however, he does not believe that the action is wrong.

***Id.*** at 960.

Here, the trial court determined:

[T]here was insufficient evidence that [Appellant] was legally insane at the time she committed the offense[s]. The [trial] court went to great lengths to determine whether or not [Appellant] was legally insane at the time of the offense[s] and rightly concluded that [Appellant] was not legally insane. [Appellant's] insanity defense fails.

\* \* \*

Here, [Appellant] did not satisfy her burden of proof. There is insufficient evidence to show that [Appellant] did not know that her actions were wrong at the time of the

- 9 -

offense[s]. Rather, the evidence shows that [Appellant] knew that her actions were wrong. She took the legally mandated firearms training safety course prior to purchasing the gun. After killing her mother, she tried to kill the potential witnesses, Mr. Harmon and Ms. Winters. After firing the shots and starting the fire, she fled the scene. In addition, Dr. Heilbrun testified that [Appellant] knew in some ways that her actions were wrong.

As the Commonwealth correctly explained in its closing argument at trial, even if [Appellant] was correct in her belief that [] demons existed and need to be exorcised, [Appellant] made the decision that the solution to the problem was to shoot and incinerate her mother and her mother's friends. Furthermore, [Appellant] believed that she had special powers and that she was God's wife. She could have used her powers, as well as her lofty status as the wife of the creator of all life, to solve the problem by another method that did not involve shooting and incinerating her own mother.

The language Dr. Heilbrun used to describe [Appellant's] mental condition shows that the court was correct in finding [Appellant] guilty but mentally ill rather than legally insane. Dr. Heilbrun found that at the time of the offense[s] [Appellant] was experiencing symptoms of a major mental disorder that significantly impaired her capacity to understand the wrongfulness of her behavior. Such language is almost precisely the same as the statutory language that defines "guilty but mentally ill."

Trial Court Opinion, 1/15/2015, at 12-13 (record citations and footnotes omitted).

As previously discussed, Appellant concedes the commission of her actions. Moreover, there is no dispute that Appellant was suffering from mental health issues at the time of the crimes. Based upon our review of the record, we agree with the trial court that the facts as presented established that Appellant was guilty but mentally ill of the aforementioned

crimes, rather than not guilty due to insanity. Dr. Heilbrun testified that Appellant began experiencing mental health issues in 2003 when she was 25 years old. N.T., 2/18/2014. Appellant believed that she was "God's wife" and that "everyone was aliens [and] worshipping the devil." *Id.* at 19. Dr. Heilbrun concluded:

> [Appellant] is an individual with severe mental illness. She was actively symptomatic around the time of the offenses. She genuinely, although this was also delusional[], believed that her daughter was being sexually molested as a result of being in her mother's care; that her mother and her mother's boyfriend were aliens who were worshipping the Devil; and that the way to release the demons from the original individuals before they were possessed was through fire.
>
> **So there really was no question for me that she understood that what she was doing was killing them**. As she explained it, she thought they were not them in the sense that it was her mother and the original people who were in those bodies. It was demons who were possessing them. But she did intend to use the gun to shoot them and then to use the fire to exorcise the demons.
>
> So my conclusion was that **she was experiencing symptoms that significantly impaired her capacity to understand the wrongfulness of this behavior**, **although she knew that she was intending to harm those individuals,** and that what was interfering with her capacity to understand the wrongfulness were, in large part, symptoms of a major mental disorder that she suffered at the time and had first begun to suffer well in advance of the offense.
>
>            \*          \*          \*
>
> [...S]he believed that what she was doing was harming individuals who were not really individuals; they were possessed by demons and that they were harming her

- 11 -

daughter. **So she knew that she was harming them and knew in some ways that this was wrong, but in other ways believed it was important for her to do both for her mother's sake and her daughter's sake.**

*Id.* at 23-24 (emphasis added). Dr. Heilbrun opined that Appellant intended to kill the victims, as shown by her taking advanced steps to secure a firearm, taking a firearm safety class, and bringing gasoline to the residence. *Id.* at 34. Appellant believed that she must "[k]ill and burn them" to "release the demons." *Id.* at 37.

While Dr. Heilbrun stated that his "clinical opinion is that [Appellant] was not sane at the time of the offense[s,]" he was reluctant to "express a conclusion about insanity" because such a "conclusion is a legal one[.]" *Id.* at 25-26. We agree that the ultimate question of legal insanity was for the trial court, serving as factfinder, to determine. Based on the foregoing, Dr. Heilbrun stated that Appellant intended to carry out her crimes – to kill and burn her victims – but lacked the substantial capacity to appreciate that such acts were wrong because she believed that she was exorcising demons. Thus, there was expert testimony that Appellant had a significantly impaired ability to understand wrong. Similar to the hypothetical boxing scenario presented in *Andre*, Appellant engaged in intentional actions under a deluded belief caused by her mental health disorders. Moreover, we note that Appellant fled the scene and police apprehended her in Maryland. Flight can indicate a consciousness of guilt. *See Commonwealth v. Housman*, 986 A.2d 822, 831 (Pa. 2009) (noting flight and concealment can constitute circumstantial evidence of consciousness of guilt). Appellant's flight from

- 12 -

the crime scene further supports the trial court's conclusion that Appellant was not legally insane. Appellant's flight demonstrates that either she knew the nature and quality of her acts or had knowledge, albeit it a diminished understanding, that what she was doing was wrong. As Dr. Heilbrun opined, Appellant knew in some ways that what she was doing was wrong. Viewing this evidence in the light most favorable to the Commonwealth, we discern no error of law in the trial court's determination that Appellant was not insane but, instead, guilty but mentally ill of the crimes charged. Accordingly, Appellant's first issue lacks merit.

In her second issue presented, Appellant claims that her convictions were against the weight of the evidence as presented. Appellant's Brief at 13-14. We have previously determined:

> A weight of the evidence claim must be preserved either in a post-sentence motion, by a written motion before sentencing, or orally prior to sentencing. Failure to properly preserve the claim will result in waiver, even if the trial court addresses the issue in its opinion.

***Commonwealth v. Griffin***, 65 A.3d 932, 938 (Pa. Super. 2013) (citations, quotations, and brackets omitted); ***see also*** Pa.R.Crim.P. 607. Upon review of the record, Appellant did not file a post-sentence motion or a written motion before sentencing. Moreover, upon review of the transcripts of the various proceedings, Appellant did not orally preserve her weight of the evidence claim prior to, or at, sentencing. Hence, we are constrained to find this issue waived.

Judgment of sentence affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>6/24/2015</u>